**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

UNITED STATES OF AMERICA

v.                                        Case No.: 4:21cr10-AW

DANIEL ALAN BAKER

          Defendant.

_____/

**GOVERNMENT'S NOTICE OF
INEXTRICABLY INTERTWINED AND/OR RULE 404(B)
EVIDENCE AND SUPPORTING MEMORANDUM OF LAW**

COMES NOW, the United States of America, by and through the undersigned Assistant United States Attorneys, and hereby gives notice of its intent to introduce evidence at trial that is inextricably intertwined with, and which provides necessary background and context for, the charged conduct. This evidence may also potentially be admitted pursuant to Federal Rule of Evidence 404(b). In an abundance of caution, the Government submits this notice and memorandum under both

rationales.[1]  For the reasons set forth below, the Government seeks an *in limine* ruling from the Court that the foregoing evidence may be admitted at trial.

## I.    Factual Background

## A.    The Charged Conduct

This case stems from the Defendant's knowing and intentional transmission in interstate commerce of two true threats to kidnap and injure the person of another.   The first true threat was posted on Facebook by the Defendant on or about January 12, 2021, as alleged in Count One of the Indictment, which reads:

> Armed racist mobs have planted the Confederate flag in the nations Capitol while announcing their plans to storm every American state Capitol on or around inauguration day. We will fight back. We will circle the state Capitol and let them fight the cops and take the building. Then we will encircle them and trap them inside. We will drive them out of Tallahassee with every caliber available. They are staging an armed takeover so only an armed community can stop them! We can win! We have a duty to and a duty to win. We have already recruited an army armed combat veterans and volunteers. As we grow we must remember security. DO NOT RSVP TO THIS EVENT! JUST SHOW UP. WE ARE CHAOTIC MALESTROM OF WILLING HANDS. The plan is for the peaceful friends to March from Railroad square and MLK to the Capitol but DO NOT ENTER! DO NOT HELP COPS OR THE ENEMY! We must encircle them so they cannot escape down

---

[1]  The Government previously provided the materials constituting and/or memorializing the anticipated inextricably intertwined/404(b) evidence during discovery and described its intent to use these materials in its discovery letter to the Defendant. The Government will continue to turn over discovery materials as they are gathered, consistent with its ongoing discovery obligations.

> Apalachee Parkway. Militant friends will ride ahead in all sorts of wheeled vehicles, bikes, scooters, atv, motorcycle, car, truck and SUV. They will push down Tennessee St and around Cascades Park with vehicles and coral the trump terrorists into the Capitol building. The enemy will have high power rifles and explosives. The enemy is coming from every racist community in the area, including Alabama and Georgia. REMEMBER THAT THE COPS WONT PROTECT US BECAUSE THE COPS AND KLAN GO HAND IN HAND! If you are afraid to die fighting the enemy, then stay in bed and live. Call all of your friends and Rise Up!

ECF No. 20 ¶ 1(c).

On or about January 14, 2021, in response to a news article about the Tallahassee Police Department being "fully staffed and prepared ahead of any potential Inauguration Day protests," the Defendant posted the following flyer on the WTXL Tallahassee Facebook page:

> CALL TO ARMS JANUARY 20th!

> Armed racists have planted the confederate flag in America's Capitol as they openly declared that they WILL CONTINUE to wage an ARMED COUP at every American Capitol, including Tallahassee, on Inauguration Day.

> We need ALL FLORIDA RESIDENTS to RISE UP! Here in Florida we must encircle terrorists who attack the Capitol! Let them take the capitol and fight with cops, SURROUND THEM AND TRAP THEM INSIDE!

> Tally residents have answered the call to arms, including combat veterans. Join us! Help protect your community from terrorists. We WILL protect capitol RESIDENTS and CIVILIANS from armed racist mobs WITH EVERY CALIBER AVAILABLE.

> This is an armed COUP and can only be stopped by an armed community!
>
> If you're afraid to die fighting the enemy, stay in bed and live.

ECF No. 20 ¶ 1(e).  The flyer included a photograph of an AK-47 style rifle at the top center of the page.[2]

The illicit conduct described above was the culmination of many months' worth of inflammatory rhetoric espoused by the Defendant on social media.  As a result, to prove that the conduct alleged in Counts One and Two of the Indictment amounted to "true threats," the Government seeks to introduce the Defendant's military history, the three firearms seized by law enforcement, and the Defendant's communications and social media posts.  The evidence the Government seeks to introduce is summarized below.

---

[2] As Magistrate Judge Michael J. Frank noted in his order finding probable cause, the AK-47 rifle was designed in 1947 for the armed forces of the Soviet Union. Because the AK-47 was used by nations adhering to the Warsaw Pact—a treaty establishing a mutual defense organization that put the Soviets in command of the armed forces of seven other member states—and is still used by nations and organizations who are unfriendly to the United States, the rifle has become a symbol of violent opposition to the United States and its citizens.  *See* ECF No. 18 at n.1.

**B.    The Potentially Inextricably Intertwined/Rule 404(b) Conduct**

In 2017, the Defendant, a former U.S. Army infantryman who deserted his platoon and received an other-than-honorable discharge as a result, joined the People's Protection Units ("YPG"), a group fighting in Syria against the Islamic State of Iraq and Syria ("ISIS") and the Turkish Government. ECF No. 2 ¶¶ 6-7. The YPG is a sub-affiliate of Kurdistan's Working Party ("PKK"), which has been designated a Foreign Terrorist Organization ("FTO") by the United States government. *Id*. at ¶ 7. While in Syria, the Defendant was featured in a Vice News documentary, where, among other things, he is seen firing an AK-47 with other members of the YPG. At one point in the video, with his rifle trained on a target, the Defendant exclaims: "I've got two bodies moving left."

Immediately upon his return from the Middle East, the Defendant was interviewed by law enforcement at Newark International Airport, where he confirmed his aspirations of luring Turkish pilots training on Unites States military bases off the installation, after which he would kill or mutilate them in furtherance of the YPG's opposition to the Turkish government. *Id*. at ¶ 8. The Defendant maintained social media accounts on Facebook, Instagram, Twitter, and YouTube, which were monitored

regularly by law enforcement.  During the summer of 2020, while racial unrest was plaguing the United States, the Defendant traveled to organized protests around the country, including Nashville, Tennessee and at the CHOP/CHAZ in Seattle, Washington.[3]  *Id.* at ¶ 9.

During this time, the Defendant regularly boasted on social media about his affiliation with the YPG, including his status as a trained YPG sniper.   Among  other  things,  he  posted  about  debilitating  law enforcement  officers,  burning  a  courthouse  in  Nashville,  Tennessee during a protest, and killing sixteen people in one day while he was overseas.   The  Defendant  was  also  quoted  in  an  article  related  to CHOP/CHAZ, where he self-described himself as a "hardcore leftist," noting that he was disappointed in the lack of violent opposition at the CHOP/CHAZ.  *Id.* at ¶ 17.  He further stated: "I told them, if they really wanted a revolution, we needed to get AK's and start making bombs.  No one listened to me." *Id.*

In the fall of 2020, the Defendant traveled to Tallahassee, Florida, where  he  attempted  to  enroll  in  the  Tallahassee  Community  College

_____

[3] CHOP/CHAZ stands for Capitol Hill Occupied Protest/Capitol Hill Autonomous Zone, which was a self-declared autonomous zone in the Capitol Hill neighborhood of Seattle, Washington, formed in response to the racial unrest that plagued the country beginning in June 2020.

("TCC") Emergency Medical Technician ("EMT") program. However, the Defendant had difficulty finding the means to pay for the program, as he attempted to acquire funding through www.gofundme.com, a social fundraising platform. *Id.* at ¶ 12. In November 2020, the Defendant posted the following on Facebook:

> "I swear on god yall if I can't raise this money I will start robbing the rich and pedophiles too. This is my last fundraiser before I commit to organized crime. I've gotten do[sic] much toxic resistance and so little help from asking nicely that I've come to the conclusion that it doesn't work. So, if this doesn't work, I'm not asking any more[sic] and I'm done being nice. I will pay for this one way or another and I'm willing to do ANYTHING to ANYONE so I don't end up homeless and hungry again. Help keep me honest or watch me compromise my integrity and character to survive."

*Id.*

On October 26, 2020, the Defendant posted a video to his YouTube channel titled, "Training for the next mission," where he is seen shooting an AK-47 style weapon at a gun range and states: "I'm coming back to Syria and I'm going to shoot any Jihadis and Turks that get in our way." *Id.* at ¶ 19. Shortly after this, for several weeks, the Defendant's social media accounts were suspended for violating their respective content policies. On January 12, 2021, days before the Inauguration of the 46th President of the United States, the Defendant, after returning from a

temporary Facebook profile ban, wrote the following: "Holy fucking shit my ban is over. Yall. So much has happened. Death to amerikka of course, fuck the president, current and elect." *Id*. at ¶ 36.

While on his social media hiatus, however, the Defendant communicated with like-minded individuals about descending on Tallahassee for a violent encounter on Inauguration Day. This included discussion on tactics, strategy, weapons the Defendant possessed and others he was attempting to obtain. On or about January 14, 2021, the Defendant inquired on Facebook about purchasing an AK-47 or a pistol from a friend's father, *id*. at ¶ 42, notwithstanding the fact that he had already purchased an AK-47 style semi-automatic long rifle and ammunition of the same caliber four days prior. ECF No. 20 ¶ (1)(b); (1)(d).

Also on January 14, 2021, the Defendant posted a video to his YouTube channel, titled "FLORIDA THIS IS A CALL TO ARMS," that showed him printing numerous "Call to Arms January 20th!" flyers, identical to the one charged in Count Two of the Indictment. ECF No. 2 ¶ 44. Around this time, the Defendant posted on social media that he was actively attempting to ascertain the number of law enforcement

officers employed by the Leon County Sheriff's Office, Florida Highway Patrol, and the Tallahassee Police Department and also warned that "#wariscoming." *Id.* at ¶¶ 42-45.

A day later, on January 15, 2021, the Defendant was arrested pursuant to a federal arrest warrant. During his arrest, law enforcement seized two firearms (one fully loaded and chambered 12-gauge shotgun and one fully loaded and chambered handgun), the Defendant's cellular phone, and located several of the "Call to Arms January 20th!" flyers identical to the one charged in Count Two. The AK-47 style rifle purchased by the Defendant on January 10, 2021, was later seized by law enforcement at a Federal Firearms Licensed ("FFL") dealer in Tallahassee, Florida.

## II.    Legal Standard

### A.    Inextricably Intertwined Evidence

Evidence of uncharged criminal conduct is intrinsic rather than extrinsic evidence, and thus not subject to the strictures of Rule 404(b), if the evidence is "linked in time and circumstances with the charged crime and concerns the context, motive or setup of the crime; or forms an integral part of the crime; or is necessary to complete the store of the

crime." *United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1210 (11th Cir. 2009). This intrinsic evidence is still subject to Rule 403, which requires that it be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *United States v. Fortenberry*, 971 F.2d 717, 721 (11th Cir. 1992).

In a criminal case, "relevant evidence is inherently prejudicial, it is only when <u>unfair</u> prejudice substantially outweighs probative value that [Rule 403] permits exclusion." *United States v. Edouard*, 485 F.3d 1324, 1346 (11th Cir. 2007) (quotation omitted) (emphasis in original).

> The district court possesses broad discretion to admit evidence if it has any tendency to prove or disprove a fact in issue. Conversely, we are mindful that the court's discretion to exclude evidence under Rule 403 is narrowly circumscribed. Rule 403 is an extraordinary remedy, which should be used only sparingly since it permits the trial court to exclude concededly probative evidence. The balance under the Rule, therefore, should be struck in favor of admissibility.

*United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006) (cleaned up).

"Evidence of the uncharged criminal conduct may not be necessary to prove the charged offense, but there is no requirement that the government proffer only enough evidence to allow the jury to convict, and no more." *Fortenberry*, 971 F.2d at 722. Evidence of uncharged criminal conduct is admissible when it contributes to the understanding of the

situation as a whole, gives context to the discovery of evidence against the defendant, and is needed to put a cohesive sequence of the crime before the jury. *See United States v. Wright*, 392 F.3d 1269, 1276-77 (11th Cir. 2004).

### B. Federal Rule of Evidence 404(b)

Pursuant to Federal Rule of Evidence 404(b), while "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1)-(2). The Eleventh Circuit applies a three-prong test to assess the admissibility of evidence under Rule 404(b):

> First, the evidence must be relevant to an issue other than the defendant's character. Second, as part of the relevance analysis, there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act. Third, the evidence must possess probative value that is not substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of Rule 403.

*United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003) (citation omitted).

The Eleventh Circuit recognizes Rule 404(b) as "a rule of inclusion, and . . . accordingly '404(b) evidence, like other relevant evidence, should not lightly be excluded when it is central to the prosecution's case.'" *Id.* (quoting *United States v. Perez-Tosta*, 36 F.3d 1552, 1562 (11th Cir. 1994)). Rule 404(b) is a rule "of inclusion which allows [extrinsic] evidence unless it tends to prove only criminal propensity. The list provided by the rule is not exhaustive and the range of relevancy outside the ban is almost infinite." *United States v. Stephens*, 365 F.3d 967, 975 (11th Cir. 2004) (cleaned up).

> A defendant who enters a not guilty plea makes intent a material issue which imposes a substantial burden on the United States to prove intent, which it may prove by qualifying Rule 404(b) evidence absent affirmative steps by the defendant to remove intent as an issue. The relevance of other crimes evidence to intent is determined by comparing the defendant's state of mind in committing both the extrinsic and charged offenses. *Id.* Where the state of mind required for both offenses is the same, the extrinsic crime is relevant to the charged offense.

*United States v. Zapata*, 139 F.3d 1355, 1358 (11th Cir. 1998). As with any evidence, Rule 404(b) evidence is subject to Rule 403.

> Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule

> 403 must be cautious and sparing . . . Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance.  It is not designed to permit the court to "even out" the weight of the evidence, to mitigate a crime, or to make a      contest      where      there      is      little      or      none.

*United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979) (cleaned up).[4]

Therefore, the "probative value" of proffered 404(b) evidence "must not be <u>substantially outweighed</u> by unfair prejudice." *Jernigan*, 341 F.3d at 1282 (cleaned up) (emphasis in original).  "This determination lies within the sound discretion of the district judge and calls for a common sense assessment of all the circumstances surrounding the extrinsic offense, including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness." *Id.* (cleaned up).

Simply because evidence is damaging or prejudicial to a defendant's case does not mean, however, that the evidence should be excluded. *See, e.g.*, *United States v. Terzado-Madruga*, 897 F.2d 1099, 1119 (11th Cir. 1990) (admitting evidence of an attempted murder of a co-conspirator to establish the existence of a drug conspiracy).  In *Terzado-Madruga*, the

---

[4] In *Bonner v. City of Pritchard, Ala.*, the Eleventh Circuit adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

court stated, "[T]he admittedly prejudicial effect of evidence concerning the attempted murder of an alleged co-conspirator neither substantially outweighs its highly probative value nor is inherently unfair."  *Id*. Because the admission of 404(b) evidence is evaluated in terms of only "unfair prejudice," not merely "prejudice" . . . "the balance in close cases is struck in favor of admissibility in determining whether its probative value is outweighed by the danger of unfair prejudice."  *Id*.

## C.    Government's Burden in Light of the Supreme Court's Decision in *Elonis v. United States*

Title 18, United States Code, Section 875(c) requires that the Government prove the Defendant: (1) sent a communication in interstate commerce containing a true threat to kidnap any person or injure the person of another and (2) transmitted the communication "for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat."  Eleventh Cir. PJI O30.3; *Elonis v. United States*, 575 U.S. 723, 135 S. Ct. 2001, 2012 (2015) (holding that section 875(c) contains a *mens rea* requirement).

The law is clear that only a "true threat" is criminally prosecutable under section 875(c).  A true threat is a "serious expression of an intent to commit an act of unlawful violence to a particular individual or group

of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003); Eleventh Cir. PJI O30.3 ("A true threat is a serious threat—not idle talk, a careless remark, or something said jokingly—that is under circumstances that would place a reasonable person in fear of being kidnapped, injured or another person being kidnapped or injured.").

"Section 875(c)'s threat element requires proof that a reasonable person would understand the communication to be a threat." *United States v. Stevens*, 881 F.3d 1249, 1253 (10th Cir. 2018). This is a "fact-intensive inquiry, in which the language [and] the context in which the statements are made" are relevant. *United States v. Wheeler*, 776 F.3d 736, 743 (10th Cir. 2015); *see also United States v. Alaboud*, 347 F.3d 1293, 1297 (11th Cir. 2003) ("The fact-finder must look at the context in which the communication was made . . . ."), *overruled on other* grounds, *United States v. Martinez*, 800 F.3d 1293, 1295 (11th Cir. 2015); *United States v. Bellrichard*, 994 F.2d 1318, 1323 (8th Cir. 1993) (noting that the threat must be "viewed in textual context and also in the context of the totality of the circumstances in which the communication was made").

Thus, context, especially in a case such as the one *sub judice*, is key, and courts "have warned against 'rigid adherence to the literal meaning

of a communication without regard to its reasonable connotations.'" *Stevens*, 881 F.3d at 1253 (quoting *United States v. Turner*, 720 F.3d 411, 422 (2d Cir. 2013)).  For example, context may include where a statement was made and how the audience responded.  *See, e.g.*, *Watts v. United States*, 394 U.S. 705, 708 (1969) (holding that statements made at political protest and at which the audience laughed were "political hyperbole" and not true threats).

But context may also include commentary that preceded the statement.  Take, for example, U*nited States v. Dierks*, where the defendant was charged with sending threatening communications to a United States Senator on Twitter.  978 F.3d 585, 589-90 (8th Cir. 2020).  The court noted that the evidence included charged tweets and uncharged tweets, because the "dozens of other [uncharged] tweets [the defendant] directed at Senator Ernst intensifies their threatening message."  *Id*. at 590.  The court reasoned that true threats are communications that are "not conditional, not clearly political in context, and do not 'in any sense contribute to the values of persuasion, dialogue, and the free exchange of ideas.'"  *Id*. (quoting *Bellrichard*, 994 F.2d at 1322).

16

Another illustration is *United States v. Ivers*, where the court affirmed the finding of a true threat, due in part to the fact that the defendant's "fixation with, and anger towards, [the victim] preceded the call by roughly two years."  967 F.3d 709, 719 (8th Cir. 2020); *see also United States v. Khan*, 937 F.3d 1042, 1047-49 (7th Cir. 2019) (noting that one charged Facebook post was preceded by other contextual uncharged Facebook posts).

## III.    Argument

### A.    Evidence of the Defendant's Military History Should be Admitted

The Court should admit evidence of the Defendant's military training and experience—as an infantryman with the U.S. Army and with the YPG—because it is necessary for the jury to understand the chain of events leading up to the conduct charged in the Indictment and it will also assist the jury in determining that the Defendant's communications were intended as true threats.  "Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if it is . . . necessary to complete the story of the crime for the jury." *McLean*, 138 F.3d at 1403.  Uncharged social media posts can lend context to charged

conduct. *See, e.g.*, *United States v. Castillo*, 564 F. App'x 500, 503 (11th Cir. 2014) (affirming district court's decision that uncharged Facebook post was inextricably intertwined because, *inter alia*, it supported the Government's theory that the charged post was a true threat)

The Defendant's enlistment in the U.S. Army, where he received combat and weaponry training, and was ultimately discharged other than honorably for deserting his platoon, is relevant to the Government's theory that the Defendant's communications were intended as true threats.  So too is the Defendant's association with the YPG, given that his social media posts are replete with references to, for instance, his time in the Middle East fighting with the YPG and his self-endorsement as a trained YPG sniper.  Moreover, the Defendant's statements and posts are laden with combat references, including his desire to return to the United States from the Middle East to lure Turkish pilots training on United States military bases off the installation to kill and mutilate them in furtherance of the YPG's interests.

Therefore, the Defendant's military history will help complete the story for the jury and will buttress the Government's theory that, given his combat training and experience, the Defendant's communications

were knowingly intended as true threats—not empty, careless remarks. *See United States v. Hall*, 404 F. App'x 742, 744 (4th Cir. 2010) (noting that the defendant's military service gave rise to his "violent tendencies").

Even if the Court were to find the Defendant's military history inadmissible as inextricably intertwined, it should be admitted under Rule 404(b) because it is evidence of the Defendant's motive, opportunity, intent, preparation, plan, and knowledge. This evidence is relevant to the jury's consideration of whether the Defendant intended to or could have prepared or planned his Call to Arms event at the Florida Capitol. *See Edouard*, 485 F.3d at 1345 ("A defendant who enters a not guilty plea makes intent a material issue which imposes a substantial burden on the government to prove intent, which it may prove by qualifying Rule 404(b) evidence absent affirmative steps by the defendant to remove intent as an issue."). The extrinsic acts will be proven through the Defendant's own statements and social media posts, which mitigates any concern of reliability that the acts occurred.

The probative value of the evidence is not substantially outweighed by undue prejudice because the Defendant's military experience—both foreign and domestic—make it more likely that he intended his

communications to be true threats.  Indeed, the Defendant boasted about being a trained sniper, his confirmed kills, returning to the Middle East to shoot "Jihadis and Turks," and his desire to kill and mutilate Turkish pilots in the United States.  The Defendant's outward fascination with military tactics and strategy crescendoed from his enlistment in the U.S. Army in 2007 through the date of his arrest.

Without the proper background, the communications comprising the charged conduct could be viewed as empty threats, but the Defendant's warrior-like public disposition make it more likely that a jury will view them as true threats, and not the product of accident or mistake.  *See Jernigan*, 341 F.3d 1282 (noting that "prosecutorial need" is a factor to consider under Rule 404(b)).  Especially because the charged conduct reflects military-style, tactical planning employed on the battlefield.  *See, e.g.*, ECF No. 20 ¶ 1(c) ("We will circle the state Capitol . . . Then we will encircle them and trap them inside . . . We will drive them out of Tallahassee with every caliber available . . . If you are afraid to die fighting the enemy, then stay in bed and live."); *id*. at ¶ 1(e) ("This is an armed COUP and can only be stopped by an armed community!"

(emphasis in original)).   Accordingly, the Defendant's military history should also be admitted under Rule 404(b).

## B.   The Seized Firearms Should be Admitted

The Court should admit evidence of the loaded shotgun and handgun seized at the Defendant's residence during his arrest, and his purchase of an AK-47 style rifle and ammunition two days prior to the first threatening communication.  The firearms are necessary for the jury to understand the chain of events leading up to the conduct charged in the Indictment and will also assist the jury in determining that the Defendant's communications were knowingly intended as true threats. *See, e.g.*, *Khan*, 937 F.3d at 1054 (affirming the admission of a firearm seized from the defendant during his arrest in a section 875(c) prosecution).

Similarly, the Defendant's purchase of an AK-47 style rifle and ammunition—similar to the one he is seen firing in videos, and the same style of rifle he included on the top center of the "Call to Arms January 20th!" flyer—is particularly probative of the Defendant's intent because it is illustrative of his thought process and desire to act on his threats. *See, e.g.*, *United States v. C.S.*, 968 F.3d 237, 245 (3d Cir. 2020) (noting

that context and circumstances, including possessing an extensive collection of weaponry and posting photos of weapons online were relevant because it showed the defendant "had the means to act on them"). Taken together, the three firearms explain the context, motive, and set-up of the violent encounter the Defendant was preparing for on Inauguration Day.

Alternatively, if the Court were to find the firearms not inextricably intertwined, they should be admitted under Rule 404(b). The Defendant's possession of two firearms—and purchase of an AK-47 style rifle—is relevant to the jury's consideration of whether the Defendant intended for his communications to be viewed as true threats. In many of his YouTube videos, the shotgun is seen tactically positioned in plain view behind him. To boot, his purchase of a military-style rifle and ammunition—again, nearly identical to the one included on the flyer charged in Count Two—mere days before the planned "Call to Arms" at the Florida Capitol, is evidence of the Defendant's motive, opportunity, intent, preparation, plan, and knowledge that his communications were intended and would be viewed as true threats.

Although the Government need not prove that the Defendant intended to carry out the threat, the probative value of the firearms' admission is not substantially outweighed by undue prejudice, especially because it will show the jury he had the means to act on his assertions and it will also assist the trier of fact in determining the Defendant's intent, which he has placed at issue by pleading not guilty.

## C.    The Defendant's Social Media Posts and Communications Should be Admitted

The Court should admit evidence of the Defendant's social media posts and communications because they are necessary for the jury to understand the chain of events leading up to the conduct charged in the Indictment and will assist the jury in determining that the charged communications were intended as true threats. The posts are relevant because the "fact-finder must look at the context in which the communication was made . . . ." *Alaboud*, 347 F.3d at 1297, *overruled on other grounds*, *Martinez*, 800 F.3d at 1295.

For months, the Defendant's inflammatory remarks on social media teetered along the fine line of criminality. Aside from publicizing his combat skills and training learned from the YPG, as discussed in greater detail in section III.A., *supra*, the Defendant authored posts and

commentary about, *inter alia*, debilitating law enforcement officers; his displeasure with the lack of violent opposition at CHOP/CHAZ, which, according to him, could only be remedied by AK-47s and bombs; preparing for war; actively trying to identify the number of law enforcement officers present in Tallahassee; and his willingness to do "ANYTHING to ANYONE." *See, e.g.*, ECF No. 2 ¶¶ 9, 12, 17, 22, 42. In addition, he actively recruited others to descend on Tallahassee on Inauguration Day in anticipation of a violent clash at the Florida Capitol.

Of course, "[t]he meaning of a statement often turns on the context in which it is made . . . ." *United States v. Briggs*, 141 S. Ct. 467, 470 (2020). It follows then, that, when placed in the proper context, the uncharged communications "complete the story of the crime for the jury," *McClean*, 138 F.3d at 1403, and "intensifies [the] threatening message[s]" charged in the Indictment. *Dierks*, 978 F.3d at 590. This is especially true given that the incendiary posts and communications are "linked in time and circumstances with the charged [communications]" and illustrate that the charged communications were the apogee of many months' worth of troubling endorsements of violence. *Id*. Alternatively, they should be admitted under Rule 404(b), because they are probative

of the Defendant's motive and intent to communicate a true threat, which will be proven through his own social media posts and communications. Finally, the probative value of the evidence is not substantially outweighed by undue prejudice, because the posts will provide the jury with an opportunity to evaluate the many months' worth of inflammatory rhetoric espoused by the Defendant on social media, giving credence to the Government's contention that the charged communications were imminent calls to violence.

## IV.    Conclusion

The Court should admit evidence of the Defendant's military history, the three firearms seized, and social media posts and communications as inextricably intertwined, or alternatively under Rule 404(b).

Respectfully submitted,

JASON R. COODY
Acting United States Attorney

*/s/ Stephen M. Kunz*
STEPHEN M. KUNZ
Assistant United States Attorney
Northern District of Florida
Florida Bar No. 322415
111 North Adams Street
Tallahassee, Florida 32301
(850) 942-8430
Stephen.Kunz@usdoj.gov

*/s/ Lazaro P. Fields*
LAZARO P. FIELDS
Assistant United States Attorney
Northern District of Florida
Florida Bar No. 1004725
111 North Adams Street
Tallahassee, Florida 32301
(850) 942-8430
Lazaro.Fields@usdoj.gov

## <u>LOCAL RULE 7.1(F) CERTIFICATE</u>

I certify that this memorandum contains 5,240 words, per Microsoft Word's word count, which complies with the word limit requirements set forth in Local Rule 7.1(F).

<u>/s/ Lazaro P. Fields</u>
LAZARO P. FIELDS
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing has been served via CM/ECF to counsel of record on this 7th day of April 2021.

<u>/s/ Lazaro P. Fields</u>
LAZARO P. FIELDS
Assistant United States Attorney
