# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**UNITED STATES OF AMERICA**

v.  Case No.: 4:21cr10-AW

**DANIEL ALAN BAKER**
      **Defendant.**
_____/

## GOVERNMENT'S MOTION FOR AN UPWARD VARIANCE FROM THE RECOMMENDED ADVISORY SENTENCING GUIDELINES

COMES NOW, the United States of America, by and through the undersigned Assistant United States Attorneys, and hereby moves the Court to vary upward from the recommended guidelines sentencing range calculated by the probation officer in this case. The final Pre-Sentence Report (PSR) has determined that the recommended sentencing guidelines range for the defendant is 33-41 months imprisonment.[1] Based upon the sentencing factors described in 18 U.S.C. § 3553(a), the Court should vary upward from the recommended guidelines and impose a lengthier term of imprisonment. For the following reasons, the United States

---

[1] The Government has filed an objection to the PSR for failing to apply the obstruction of justice enhancement pursuant to U.S.S.G. § 3C1.1, due to the defendant's false testimony at trial. This would result in a two-level increase, making the recommended sentencing guidelines range 41-51 months imprisonment. The United States believes an upward variance from the higher guidelines range is appropriate for the reasons stated in this motion.

1

respectfully requests the Court to vary upward from the recommended guidelines sentencing range in this case.

## I. Procedural Background

On February 18, 2021, the defendant was indicted by a Federal Grand Jury charging him with the knowing and intentional transmission in interstate commerce of two true threats to kidnap and injure the person of another. The first true threat was posted on Facebook by the Defendant on or about January 12, 2021, as alleged in Count One of the Indictment. *See* ECF No. 20 ¶ 1(c). The second true threat was posted on or about January 14, 2021, in response to a news article about the Tallahassee Police Department being "fully staffed and prepared ahead of any potential Inauguration Day protests," the Defendant requested a "Call to Arms" on the WTXL Tallahassee Facebook page. *See* ECF No. 20 ¶ 1(e). The "Call to Arms" included a photograph of an AK-47 style rifle at the top center of the page. The conduct charged in the Indictment was the culmination of many months' worth of inflammatory rhetoric espoused by the Defendant on social media.

On May 6, 2021, the Defendant was found guilty by a jury on both counts of the Indictment. The Defendant's sentencing is scheduled for September 13, 2021 at 10:00 am. The final PSR prepared by the U.S. Probation Officer has determined that the recommended advisory sentencing guideline is 33-41 months' imprisonment.

## II. Factors To Be Considered In Sentencing

### A. Title 18, United States Code, Section 3553(a)

Title 18, United States Code, Section 3553(a), in pertinent part, provides:

(a) **Factors to be considered in imposing a sentence –**

The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of this subsection. The court, in determining the particular sentence to be imposed, shall consider---
    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
    (2) the need for the sentence imposed ---
        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B) to afford adequate deterrence to criminal conduct;
        (C) to protect the public from further crimes of the defendant; and

* * *

The probation officer calculated a recommended sentencing guidelines range of 33-41 months' imprisonment. The guideline calculations have not taken into consideration a number of circumstances relating to the nature and circumstances of the offense and the history and characteristics of the Defendant that warrant a sentence above the recommended guidelines range. The following are factors that the sentencing guidelines did not take into account and which the Court should consider in sentencing the Defendant to a sentence above the recommended guidelines range:

1. The threats were posted online by the Defendant seeking to cause other individuals to join the Defendant to commit acts of violence against individuals who planned protests at the Florida Capitol Complex. The Defendant's threats created a substantial risk that the Defendant would seek to engage in violent acts such as those he threatened, thereby endangering members of the community. Further, the Defendant made threats of violence—and was attempting to recruit others to commit acts of violence—demonstrating that he posed a danger to the community. The threat of concerted criminal activity poses a greater danger to society than an individual acting alone.

2. The sentencing guidelines do not take into account the fact that at the time the Defendant made the threats, the American public was extremely tense and anxious throughout the country, as a result of the riot at, and unlawful entry into, the United States Capitol that occurred just a week earlier, and citizens everywhere were truly concerned about violence and confrontation at the seats of their federal and state governments. Further, there was much consternation among citizens concerning the results of the presidential election and the newly elected President's inauguration scheduled in just a week, and the nation was very polarized.

This tense atmosphere included the marshalling of extensive local, county, state, and federal law enforcement authorities in the greater Tallahassee area who were placed on alert so authorities would be prepared to handle problems arising from lawful protests, including clashes between protestors and counter-protestors, that were set to occur. Indeed, throughout the country, tensions were exacerbated, and the situation was akin to a powder keg, which the Defendant attempted to ignite with his calls to armed conflict in the streets. The explosive climate that existed when the Defendant transmitted his threats is not taken into account as a factor for calculating the sentencing guidelines for the defendant's transmission of threats. However, it is a significant factor that the Court should consider in determining the appropriate sentence of the Defendant.

3. U.S.S.G. § 2A6.1(b)(2)(A) provides for a two-level increase if the offense involved more than two threats. For purposes of U.S.S.G. § 2A6.1(b)(2)(A), an offense involves more than two threats when the defendant communicates a true threat on greater than two occasions. *See United States v. Scott*, 441 F.3d 1322, 1327 (11th Cir. 2006) (affirming application of enhancement where the defendant mailed two letters containing true threats but in the second letter there were two distinct threats in two distinct envelopes). However, the guidelines do not take into account a situation such as here, where the Defendant communicated 40 times the number of threats described in this specific offense characteristic. As the Government noted in

its objections to the PSR, ECF No. 87, the Defendant transmitted his "Call to Arms" flyer on 87 separate occasions: 79 times on Facebook, 4 times on Instagram, 3 times in text messages, and in one e-mail. The "Call to Arms" flyer is the same one described in Count Two of the Indictment for which the jury convicted the Defendant. Due to the sheer volume of threats repeatedly transmitted by the Defendant – 87, which was not contemplated by the sentencing guidelines, the Government submits that the large number of threats transmitted by the Defendant is an additional basis for an upward variance.

4.     The dangerousness of the Defendant, not considered entirely by the sentencing guidelines analysis, is an important factor in determining the appropriate sentence for the Defendant. The evidence in this case revealed that the Defendant repeatedly expressed an interest in violence and endorsed violent means to advance the beliefs that he espoused. For example, he endorsed stabbing, the manufacture and use of bombs, violent revolution, taking up arms against then-President Trump, "death to amerikka," "slaying" his enemies, "voting from the rooftops" (the use of sniper rifles from roofs), the murder of Turkish pilots, and support for anarchy. This conduct indicates that the Defendant likely would endorse and use violence against others in the future.

5. As the evidence at trial reflected, the Defendant owned two firearms (which were loaded with ammunition), purchased an AK-47 type, .22 caliber rifle, which he had not yet retrieved from a pawn shop, and was seeking to obtain multiple additional firearms, including an AK-47 type rifle, and hollow point ammunition. The AK-47 style rifle and hollow point ammunition were purchased on January 10, 2021, (Trial Ex. 34), mere days before he made his "Defend Tallahassee" and "Call to Arms" posts, and less than twenty-four hours after he received $500.00 via PayPal. Because firearms make those who possess them more lethal, possession of, and access to, firearms make defendants more dangerous. The Defendant also instructed another person how a .22 long rifle can be deadly when used as a silenced weapon with subsonic rounds and a water bottle. Trial Ex. 24.

6. A careful review of the Defendant's posted threats clearly demonstrate that the Defendant expected death to be a result of his "event." The posts clearly indicate that the Defendant intended to inflict death on others and that he fully expected that he or his "militant friends" would die in the "event." *See* ECF No. 20 ¶¶ 1(c), 1(e) ("If you are afraid to die fighting the enemy, then stay in bed and live."). Thus, his threats could reasonably be considered threats of deadly violence.

7. Other facts in this case that also demonstrate the dangerousness of the Defendant include that he used social media to encourage and instruct others to harm law enforcement officers.

8. The Defendant's background also shows his dangerousness. In 2017, the Defendant traveled to Iraq and Syria to join the "People's Protection Units" (also known as the "YPG") in fighting forces of the "Islamic State of Iraq and the Levant" and the Republic of Turkey. As the Defendant told FBI Special Agent Denise Biehn in March of 2019, when he joined the YPG he expected "PKK" (an organization the defendant acknowledged is a terrorist organization, which is a Marxist terrorist organization). The Defendant stated that the YPG is affiliated with the PKK, and PKK members trained at the YPG training academy in Syria. The Defendant remained in the Middle East from approximately 2017 to April 2019. He was filmed fighting, admitted to training others in military tactics, and told people that he was trained as a sniper. After returning to the U.S., the Defendant referred to himself as a "killer:" Trial Ex. 23. The Defendant had the training and inclination to carry out his posted threats and would be willing to kill people if they espoused views or ideologies that he opposed. This past conduct makes him a continuing threat and danger to the community at large.

9. Sources informed the Government that the Defendant had stated that he would kill Turkish military aviators who were training in the United States as a means of helping the YPG. Although the Defendant told the FBI in an interview in April 2019 that he didn't mean the threats to kill Turkish pilots and only made those statements to ingratiate himself with YPG leaders, his statements about killing others on behalf of a particular group that he was involved in, indicates that the defendant expressed an intent to kill people to advance causes that he supports. Moreover, he later posted a video where he stated his intent to return to Syria to kill any Turks that get in his way. Trial Ex. 16. Such statements reflect his true intent and dangerousness, which reflect the significant risk of violence attributed to him if not incarcerated for a significant period of time.

10. Other statements that the Defendant made to a TSA agent in January 2020 support that the Defendant is a dangerous and violent person. At trial, Transportation Security Administration Supervisor Jeffrey Wynn testified that the Defendant was encountered at the Tampa International Airport on January 6, 2020, and openly and proudly discussed how much he enjoyed "killing."

11. Trial Exhibit 16, a YouTube video posted by the Defendant on October 19, 2019 is a short video, but speaks volumes concerning his dangerousness and propensity for violence. The Defendant took this video of himself shooting an automatic rifle at a gun range. While the automatic rifle is being re-loaded, the

Defendant states: "I'm coming back to Syria and I'm going to shoot any jihadis and Turks that get in our way," after which he continues firing the automatic weapon. The Defendant's own words, and his enjoyment of firing the automatic weapon, provide the Court with unique insight into the Defendant and his dangerous and likelihood for violence.

### III.    The Law

The Defendant's case falls outside the "heartland" of threat cases because of the Defendant's violent nature, acquisition of a rifle, the preparation that went into his threats, and the circumstances surrounding the threats—*i.e.*, the public turmoil around the time of the Inauguration of a new President. *See United States v. Irey,* 612 F.3d 1160, 1182 (11th Cir. 2010) (en banc) (explaining that a case falls "outside the heartland" when "there [is] something unusual, either about the defendant or the circumstances surrounding the crime," that warrants a sentence outside of the guidelines range). "[A] district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case outside the heartland to which the Commission intends individual Guidelines to apply." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quotation marks omitted).

Upward variances are routinely applied in cases where the § 3553(a) factors justify them. *See, e.g.*, *United States v. Rosales-Bruno*, 789 F.3d 1249 (11th Cir. 2015) (affirming 87-month upward variance from 21–27-month guideline range in

illegal reentry case); *United States v. Overstreet*, 713 F.3d 627, 636-640 (11th Cir. 2013) (affirming 420-month sentence where guidelines recommendation was only 180-210 months); *United States v. Earley*, 686 F.3d 1219, 1221-22 (11th Cir. 2012) (affirming 210–month sentence where guidelines range was only 78–97 months); *United States v. Shaw*, 560 F.3d 1230, 1238-41 (11th Cir. 2009) (affirming statutory maximum 120–month sentence where guidelines range was only 30–37 months); *United States v. Turner*, 474 F.3d 1265, 1274, 1280-81 (11th Cir. 2007) (affirming 240–month sentence despite guidelines range of only 51–63 months and defendant's lack of criminal history).

An upward variance is also appropriate despite the Defendant's lack of criminal history. In *Turner*, a case involving fraud, theft of mail, and obstruction, defendant Turner had no criminal history, yet the district court varied upward substantially because the defendant had threatened federal agents during the execution of a search warrant and believed the "defendants were fully capable of such actions . . . and had the means of completing such acts." 474 F.3d at 1274. Aside from having no criminal history, defendant Turner was gainfully employed, honorably served in the U.S. military, and was a mother of four. *Id*. at 1281. Nevertheless, her crimes presented a "very serious matter" to the district court, which ultimately resulted in an affirmance. *Id*.

Among other things, the Defendant: threatened to lure Turkish pilots off U.S. military bases and kill them; posted on social media that he was "down to slay enemies again" on November 3, 2020, Trial Ex. 15; posted a photograph depicting bombs being dropped with the caption, "Jacksonville nazis gonna be real sad when this happens to their hq," Trial. Ex. 20; and asked someone he was vetting whether they would be "willing to assault a cop at a protest," Trial Ex. 22.

The Court can rely on certain aspects of the defendant's conduct that it has considered in imposing an enhancement, particularly where a defendant's conduct was egregious or extraordinary. *See United States v. Jenkins*, 677 F. App'x 566, 569 (11th Cir. 2017) (unpublished) (citing *United States v. Amedeo*, 487 F.3d 823, 833-34 (11th Cir. 2007)).

### IV. Conclusion

The Government respectfully submits that for the reasons described above, the § 3553(a) factors strongly support a prison sentence well above the recommended guidelines range. The threats made by the Defendant in this case should not be considered in a vacuum, but instead in conjunction with all of the facts and circumstances surrounding the crimes committed, and the history and characteristics of the Defendant. The Defendant was arrested by the FBI before the Defendant could commit acts of armed violence. The Defendant is dangerous and

has a propensity for violence. To protect the public from further crimes of the Defendant, an upward variance from the sentencing guidelines is warranted.

Respectfully submitted,

JASON R. COODY
Acting United States Attorney

*/s/ Stephen M. Kunz*
STEPHEN M. KUNZ
Assistant United States Attorney
Northern District of Florida
Florida Bar No. 322415
111 North Adams Street
Tallahassee, Florida 32301
(850) 942-8430
Stephen.Kunz@usdoj.gov

*/s/ Lazaro P. Fields*
LAZARO P. FIELDS
Assistant United States Attorney
Northern District of Florida
Florida Bar No. 1004725
111 North Adams Street
Tallahassee, Florida 32301
(850) 942-8430
Lazaro.Fields@usdoj.gov

## LOCAL RULE 7.1(F) CERTIFICATE

I certify that this memorandum contains 2,699 words, per Microsoft Word's word count, which complies with the word limit requirements set forth in Local Rule 7.1(F).

*/s/ Stephen M. Kunz*
STEPHEN M. KUNZ
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been served via CM/ECF to counsel of record on this 8th day of September 2021.

*/s/ Stephen M. Kunz*
STEPHEN M. KUNZ
Assistant United States Attorney