1

**UNITED STATES DISTRICT COURT**

2    **NORTHERN DISTRICT OF FLORIDA**
     **TALLAHASSEE DIVISION**

3
                                  )
4    UNITED STATES OF AMERICA,     )
                                  )
5              Plaintiff,          ) Case No: 4:21cr10
                                  )
6         v.                       ) Tallahassee, Florida
                                  ) April 28, 2021
7    DANIEL ALAN BAKER,            )
                                  ) 1:31 PM
8              Defendant.          )
     _____ )

9
                     **MOTION HEARING TRANSCRIPT**
10       **BEFORE THE HONORABLE ALLEN C. WINSOR**
              **UNITED STATES DISTRICT JUDGE**
11               **(Pages 1 through 103)**

12   APPEARANCES:

13   For the Plaintiff:     United States Attorney's Office
                            By:  STEPHEN M KUNZ
14                               LAZARO FIELDS
                                 Asst. U.S. Attorneys
15                               Stephen.Kunz@usdoj.gov
                                 Lazaro.Fields@usdoj.gov
16                          111 N. Adams Street, Fourth Floor
                            Tallahassee, Florida 32301
17
     For the Defendant:     Federal Public Defender
18                          By:  RANDALL MURRELL
                                 ELIZABETH VALLEJO
19                               Attorneys at Law
                                 randolph_murrell@fd.org
20                          227 N Bronough Street, Suite 4200
                            Tallahassee, Florida 32301
21

22                  *LISA C. SNYDER, RPR, CRR*
                **Official United States Court Reporter**
23          **111 North Adams Street, Tallahassee, FL 32301**
               **(850)567-1374 * lisasnydercr@gmail.com**
24

25              *Proceedings reported by stenotype reporter.*
         *Transcript produced by Computer-Aided Transcription.*

**P R O C E E D I N G S**

1

2        (Call to Order of the Court at 1:31 PM on Wednesday, April

3    28, 2021.)

4            THE COURT:  Please have a seat.

5            Good afternoon everyone.  This is 4:21-cr-10, United

6    States versus Daniel Baker again.  Mr. Baker is here.  Mr.

7    Murrell is here on his behalf.  And Mr. Kunz and Mr. Fields are

8    here for the government.

9            We have a couple of things today that -- *Daubert* issue

10   is one of them and I figured we would start there.  My

11   understanding from Mr. Johanssen is the witnesses are synced up

12   here and ready.  And so unless someone has a better way of doing

13   it I thought maybe we'd just go right into the examination.

14           MR. MURRELL:  I was hoping what we could do, and if

15   it's agreeable to the Court, do Dr. Enders first and then I'll

16   ask him some questions regarding *Daubert*.  And then I assume the

17   government will want to ask some questions on that topic.  And

18   then I suppose at that point if the Court decides his testimony

19   is not admissible I would like to go ahead and proffer what his

20   testimony would be.  And then after we're done with Dr. Enders

21   we would move on to Mr. Phillips.

22           THE COURT:  That's fine.  I think, I guess what I was

23   thinking is that through your examination you sort of take care

24   of the proffer anyway.  I mean, I think to understand whether it

25   would be admitted under any circumstance or whether it complied

1    with *Daubert* I would need to know sort of the sum and substance

2    of what he would say.

3         MR. MURRELL:  It won't be lengthy, I can tell the

4    Court that.

5         THE COURT:  Okay.  So we could do all that and then he

6    can be excused and then we could do the same thing for the other

7    and then have argument on what to make of it all.

8         MR. MURRELL:  Sure.

9         THE COURT:  Okay.  So, then can we get the witness on

10   here?

11        MR. MURRELL:  It would be Dr. Enders.

12        THE COURT:  Dr. Enders.

13        MR. MURRELL:  And, Judge, while we're waiting, I do

14   have two defense exhibits.  I have Exhibit Number 1, which is

15   Dr. Enders' CV.  And I'll go ahead and introduce Exhibit 2 as

16   well, if that's fine, which is Mr. Phillips' CV.

17        THE COURT:  Okay.  Any objection?

18        MR. FIELDS:  No objection, Your Honor.

19        THE COURT:  Those will be admitted.

20      (DEFENDANT EXHIBIT NUMBERS 1 and 2 received in evidence.)

21        MR. MURRELL:  Judge, I would ask the Court to call Dr.

22   Enders as a witness.

23        THE COURT:  Okay.  Dr. Enders, can you hear me?

24        THE WITNESS:  Yes, I can.

25        THE COURT:  Okay.  Very good.  I'll ask the clerk of

Direct Examination - Dr. Adam Enders

```
 1   court to swear you in, but before we do that let me just ask you
 2   to, because we are on this video link and sometimes there's a
 3   little delay so if you'll just pause before answering any
 4   question.  And then also do your best to speak clearly just so
 5   our court reporter can get everything down.  And that will be
 6   helpful.  And if you'll give us just one moment, what you said a
 7   minute ago was a little loud.  And our IT specialist is going to
 8   try and -- that was coming through the internal system.
 9           Dr. Enders, will you just say a thing or two so we can
10   check the audio?
11           THE WITNESS:  Sure.  Testing, testing.
12           THE COURT:  Thank you.
13           DR. ADAM ENDERS, DEFENSE WITNESS, DULY SWORN
14           THE WITNESS:  Adam Enders, E-n-d-e-r-s.
15           THE COURT:  Before you begin, I didn't notice Ms.
16   Vallejo there when I was recognizing the other counsel so I
17   apologize.  But Ms. Vallejo is here as well.
18           You can go ahead whenever you're ready, Mr. Murrell.
19                          DIRECT EXAMINATION
20   BY MR. MURRELL:
21   Q.   Dr. Enders, good afternoon.  We've talked on the phone but
22   we haven't met face-to-face.  I'm Randy Murrell.
23           MR. MURRELL:  And, in fact, I might take off this mask
24   if it's acceptable to the Court.
25           THE COURT:  Yes, sir.
```

Direct Examination - Dr. Adam Enders

1    BY MR. MURRELL:

2    Q.   You might be able to hear me better that way.

3         Dr. Enders, I do have a copy of your CV.  Is the

4    information in your CV accurate?

5    A.   Yes.

6    Q.   Okay.  You are an assistant professor there at the

7    University of Louisville?

8    A.   Correct.

9    Q.   And, you're in the political science department?

10   A.   Correct.

11   Q.   You received your Ph.D. in 2016 from Michigan State

12   University?

13   A.   Yes.

14   Q.   In the field of political science.  Do you have any

15   particular areas where you concentrate your efforts?

16   A.   My broad area of research is in public opinion and

17   political psychology.  More specifically, however, I do research

18   for psychology of conspiracy belief and political extremism.

19   Q.   And looking over your list of peer reviewed articles it

20   looks like you have a number of articles that deal with sort of

21   the polarization of the political spectrum here in the United

22   States; is that a fair description?

23   A.   Yes, that's correct.

24   Q.   And you also have a fair number of articles dealing with

25   conspiracy theories?

Direct Examination - Dr. Adam Enders

1    A.    Yes.

2    Q.    This is what we call a *Daubert* hearing and sometimes the

3    issue of methodology comes into play.  When you're studying an

4    issue, when you're writing about things like conspiracy theories

5    and polarization, is there a particular method you use when

6    you -- to get the results and gain the information you need?

7    A.    I use sort of a hybrid methodology for determining some

8    elements of the sort of psychology behind conspiracy belief, the

9    sort of attitudinal and predispositional ingredients of these

10   kinds of beliefs.  I do a lot of polling.  So survey-based

11   research.  Most of that would be national representative

12   probability samples of the American electorate.  Some of it is

13   smaller experimental based studies.

14        And then I also spend time doing observational work which

15   involves tracking conspiracy groups online, whether that's on

16   YouTube or other sort of darker corners of the web.

17   Q.    I notice that in your list of articles you have one

18   category entitled "Peer Reviewed."  When we talk about peer

19   reviewed, what do you mean by that?

20   A.    By peer reviewed I mean that everything in that section has

21   been vetted anonymously by some group of my own peers who have

22   Ph.D.'s and are usually from similar institutions.  I have no

23   influence on that.  They are able to evaluate my work without me

24   knowing who they are or me who they are.

25   Q.    I notice too that one of the topics you teach is research

Direct Examination - Dr. Adam Enders

1  design and research methods.

2  A.   That's correct.

3  Q.   And I know there is a lot involved in that, but in just a

4  few sentences could you tell us what those courses involve?

5  A.   Part of the course is ostensibly philosophy of science, so

6  how we come to know what is true, what the research process

7  looks like.  And another sort of major component of that is

8  basically statistical methods.  So I teach statistics courses at

9  the University of Louisville, also at the University of

10  Michigan, and sometimes workshops in other places as well.

11  Q.   So I'm going to ask you in just a minute about George Soros

12  and the role he plays in right-wing conspiracy theories.  I

13  suppose the question is, how do you have this information, how

14  do you have this knowledge about George Soros?  Where does it

15  come from?

16  A.   Partially from polling.  Partially from the work I do

17  investigating conspiratorial content online.  So you've got a

18  pretty large contingent of conspiracy content producers is what

19  I would call them, from people like Alex Jones and Infowars to

20  individual YouTubers that usually have kind of monetized, you

21  know, the spread of conspiracy beliefs in a sense.

22       And one thing that most of them have in common, at least

23  the ones that are trafficking in ideas that are more attractive

24  to people, not political, right, is that George Soros plays very

25  heavily in those ideas and the specific conspiracy theories that

Direct Examination - Dr. Adam Enders

1    they promote.

2    Q.   So who is George Soros?

3    A.   George Soros is an American Hungarian born.  He's an

4    investment fund manager sort of by trade.  He's also a

5    philanthropist.  He has donated considerable funds to liberal

6    causes, what people would see as liberal or perhaps left-wing

7    causes.  I make the distinction only because some of that's in

8    the United States, some of it's been to central and eastern

9    European countries.

10        And, he also happens to be Jewish.  So that sort of -- this

11   combination of being a rich individual, somebody who gives

12   regularly to political causes in one direction, which is to say

13   the left, and then his Jewish Heritage sort of make him a

14   primary target for conspiracy theories.

15   Q.   What are some of the conspiracy theories involving George

16   Soros?

17   A.   Basically any version of a conspiracy theory you can think

18   of.  There is probably an antisemitic version of it, which means

19   that there is also quite likely a Soros version of it.  So he

20   figures into COVID conspiracy theories that he, like other rich

21   shadowy figures like Bill Gates was intentionally promoting

22   Corona Virus or they stand to gain financially from people

23   becoming ill from the disease.

24        He figures into basically anything that involves the left.

25   So because of his wealth he is promoting Antifa attacks.  He's

9

Cross-Examination - Dr. Adam Enders

1    promoting BLM related violence.  He was funding these sort of

2    shadow groups at the capitol riot that weren't actually Trump

3    supporters, or other people who may be on the political right,

4    but actually leftist, radical leftist.

5              MR. MURRELL:  Thank you.  That's all the questions I

6    have.  The U.S. Attorney's Office may some questions for you.

7                        CROSS-EXAMINATION

8    BY MR. FIELDS:

9    Q.   Good afternoon, Dr. Enders.  My name is Lazaro Fields.  I'm

10   an Assistant United States Attorney.  I'm going to ask you a few

11   questions, if that's okay?

12   A.   Okay.

13   Q.   Mr. Murrell asked you about Mr. Soros.  And I don't mean to

14   be flippant, but have you ever met Mr. Soros?

15   A.   No.

16   Q.   Okay.  And so the basis of your opinion is, I think you

17   said, polling and investigating content online; is that fair?

18   A.   Yes.

19   Q.   And when you say polling, who are you polling?

20   A.   Typically it is nationally representative samples of the

21   U.S. adults.  So a sample of usually between a thousand and

22   2,000 people that's designed to be reflective of the

23   characteristics of the U.S. population based on census estimate.

24   Q.   Are you doing the polling yourself or do you hire somebody

25   else to do the polling?

Cross-Examination – Dr. Adam Enders

1   A.    Typically contract with other companies that contact

2   individuals with the instrument that I devise.

3   Q.    So, in essence you tell the contractor who you want to poll

4   and what issues you want to poll and they essentially carry it

5   out for you; is that a fair representation?

6   A.    Yes.

7   Q.    And you said that you poll approximately a thousand to

8   2,000 people who represent the citizens of the United States.

9   Is that geographically reflective of the entire country?

10  A.    Typically speaking, yes.

11  Q.    So you would poll an issue in all 50 states not just in New

12  York and California, for instance?

13  A.    I have done state specific polls, but when I say nationally

14  representative, I would mean across the United States based on

15  age, race, education levels, and geography.

16  Q.    Specific to Mr. Soros, could you please elaborate on what

17  states or the criteria that you use to ascertain the individuals

18  that you wanted to poll specific to Mr. Soros?

19  A.    The way that it typically works is that contractors have

20  large panels of individuals who participate in surveys.  The way

21  that they contact -- they contact those individuals through

22  various methods.  And we randomly sample from these very large

23  panels of individuals that exist across the United States, such

24  that the final result in a sample is reflective of the

25  characteristics of the United States population as a whole based

Cross-Examination - Dr. Adam Enders

1    on what -- our very best guess of what the population looks

2    like, which is the census.

3    Q.   Now, I want to move to the second part of your research

4    which I think you said was investigating content online.

5         What content, or who are you essentially investigating, to

6    use your words?

7    A.   I am investigating individuals that are promoting

8    conspiratorial ideas through various menus online.  So an

9    example of this might be if we were thinking about QAnon,

10   something that probably most individuals have heard of at this

11   point, there was, before they were recently scrubbed, a large

12   contingent of individuals who had channels that were

13   specifically devoted to interpreting conspiratorial messages

14   that were being left online by this Q figure.  So the channels

15   were essentially devoted to this sort of thing.  And that's what

16   I mean by investigating conspiratorial content online.

17   Q.   And, online, is that Instagram, Facebook, YouTube, or is it

18   just -- what mediums are you looking at?

19   A.   Not just YouTube.  Instagram, Facebook, Twitter, to some

20   extent Reddit, other image boards like 4N and HN which are kind

21   of darker corners of the Internet.  So I don't necessarily

22   contain my analyses to only one platform.

23   Q.   And who specifically is doing the investigating?  Is it

24   yourself or is it your students or perhaps, again, a

25   third-party?

1   A.   No, this would all be me.

2   Q.   Okay.  How much of your -- on average, how much of your 40

3   hour-work-week, let's say, is dedicated to investigating content

4   online?

5   A.   It varies, but I guess I would say maybe upwards of between

6   5 and 10-hours a week.

7   Q.   And what you do essentially is you scroll through the

8   mediums that you just discussed, Reddit, YouTube, other social

9   media platforms, and you try to get a feel for what people are

10  saying as to a particular issue; is that fair?

11  A.   Yes, there are, you know, there is no way to possibly

12  capture it all, but there are certain groups and individuals and

13  channels and, you know, whatever the platform happens to host

14  that tend to have, you know, more (Indiscernible) than others,

15  that have more followers, more shares, et cetera.  And that's

16  frequently where I focus my efforts.

17  Q.   Are there other individuals perhaps in your field who are

18  critical of some of your opinions, specifically, as it relates

19  to Mr. Soros?

20  A.   Not that I'm aware of.  I -- I -- I don't necessarily write

21  much about Soros, specifically, but about conspiracy theories

22  more generally, of which he is one of a broad cast of

23  characters.

24  Q.   Have you written specifically about Mr. Soros?

25  A.   He's certainly been mentioned in papers, but I've never

Cross-Examination - Dr. Adam Enders

1   written -- written something about George Soros specifically.  I

2   never devoted an entire article to him, for example.

3            MR. FIELDS:  Nothing further, Your Honor.  Thank you.

4            THE COURT:  Anything else, Mr. Murrell?

5            MR. MURRELL:  No, sir.

6            THE COURT:  Doctor, we're going to separate from you

7   for a moment, but if you'll hold on the line there may or may

8   not be some follow-up questions.  Just a moment.

9            All right.  Here's the question, we started talking

10  about this a little bit last week at the previous hearing.  I'm

11  still not sure what the -- and this relates to why we're here

12  today on the *Daubert* issues.  I'm still not sure what it is you

13  would have him say.  There was some discussion about his

14  opinions about George Soros, his opinions that there is this

15  concept of conspiracy theories, and then you talked about -- so

16  that's one issue.  I want to hear what it is that you would have

17  him say.

18           And then, two, talking about the reliability or

19  methodology, there was all this discussion about what he does,

20  but I think it was all just broadly speaking as to what he does

21  for his overall scholarship.  We need to know what he does to

22  come up with the opinions that you would have him put on.  And I

23  don't --

24           MR. MURRELL:  The opinions -- I'm going to have him

25  say what he said there.  Frankly, I think most of us could

1  provide the Court with that same information.  We all know who

2  George Soros is.  We all know that he's an object of conspiracy

3  theorists.  Most of the jurors will probably know that, but they

4  may not all know that.  And I don't think this is really

5  controversial.  I mean, I think this is pretty plain vanilla.

6          The whole point of this is that the government wants

7  to introduce a lot of these text messages and so on and suggest

8  that Mr. Baker was serious about these -- he has presented

9  serious threats.  The one I want to introduce is the one that

10 says he's getting money from George Soros, which is just on its

11 face frankly ridiculous.  And I just -- that will help show the

12 jury that they can't take all of these posts at face value.

13         Now, as far as methodology itself, I think he's more

14 than qualified.  You know, like I say, frankly, I think you can

15 take the average guy off the street and he can tell you who

16 George Soros is.  So this is not a complicated issue.

17         He does read -- I mean, I don't know that you could

18 find anybody better qualified to talk about conspiracy theories.

19 And George Soros is part of that.  So, I think, frankly, I don't

20 even know why -- well, I don't want to say that, but I think

21 that he's clearly qualified.  His testimony is clearly relevant.

22             THE COURT:  Mr. Fields?

23             MR. FIELDS:  Your Honor, if I could just briefly put

24 this into context to I think what the trial may look like, which

25 might be helpful.

1          The government, again, is not going to just --

2          THE COURT:  No, I understand that.  And we're sort of

3    mixing the issues here.  There's a separate issue about whether

4    the fact that I think, as Mr. Murrell points out, most people

5    know that, one, George Soros exists.  Two, he's a billionaire

6    who gives a lot of money to political causes that not everyone

7    agrees with.  That may or may not come in.

8          But the principal question here, well, we have the

9    witness here to figure out methods and things like that, is he

10   qualified to talk about those things?  And then if I decide he

11   is, and if I decide that, if that becomes a relevant issue, that

12   needs to be addressed at trial, what is the government's

13   position as to whether he's the vehicle to do that?

14         I mean, so -- and I know that they do overlap because

15   obviously one of the things you look at in *Daubert* is whether

16   it's useful to the jury, and if it's an irrelevant point or is

17   subject to some 403 argument then it's not going to come in

18   anyway.  But, for purposes of his qualifications to speak as an

19   expert, his methodologies to come up with his opinion which the

20   long and short of the opinion is just that George Soros is a

21   billionaire who gives to causes and some people on the Internet

22   attribute conspiracy theories to him.  That's the long and short

23   of it?

24         MR. MURRELL:  Yes.

25         MR. FIELDS:  As to qualifications, he's qualified to

1    be a political science professor.  I don't doubt that.  But, by

2    his own admission he hasn't written a single thing about George

3    Soros, maybe in passing, but nothing of substance.  So I don't

4    think he's qualified, specifically, to give an opinion as to

5    George Soros.

6              As to reliability --

7              THE COURT:  It's not an opinion about George Soros.

8    That's why -- he's not going to say George Soros is good or bad

9    or indifferent.  It's going to be that people that he is

10   studying, and I'm not saying you're wrong about his

11   methodologies, but the opinion or the question is, if someone is

12   going to study this, how are they going to do it in a reliable

13   way to come up with a conclusion that these types of theories

14   exist?

15             MR. FIELDS:  And I guess that gets us to the second

16   prong which is reliability.  And the government's position is

17   his polling may, for argument sake, may be somewhat

18   representative of the country, it may be somewhat accurate, but

19   just respectfully five or 10-hours a week scrolling through

20   social media, it's not reliable, it's not something that an

21   expert who jurors give great weight to can come into this court

22   and testify, based on spending a couple hours a week scrolling

23   through social media.  So the government's position is that's

24   just not reliable enough to even present to the jury.

25             And then the third prong, it's not helpful really to

1    determine anything at issue.

2            Your Honor, that's our position.

3            THE COURT:  Okay.  Anything else, Mr. Murrell?

4            MR. MURRELL:  I think the standard the government

5    poses would eliminate anybody as expert testimony or is an

6    expert telling us who George Soros is.  I don't think there are

7    a lot of people out there that have spent their life studying

8    George Soros.  He might be part of a study, as he is with Dr.

9    Enders.  But if the requirement is that somebody that studies

10   George Soros exclusively and writes about it you are not going

11   to find that person.

12           THE COURT:  Okay.  Well, here's what I think, I do

13   think he's qualified as a political scientist.  I think he does

14   study what is being said on the Internet by groups.  And I think

15   that's a valid field of political science.  And, I sort of agree

16   with the last thing you said Mr. Murrell that there's not

17   necessarily a more reliable way to study this than to go out

18   there and see what's out there, write about it.  And so, I do

19   think that the methods that he uses are fine.

20           The last question about whether it assists the trier

21   of fact, I mean, you said a couple times he's not an expert on

22   who George Soros is.  That's not a subject of expert testimony.

23   Really who George Soros is or whether he even exists doesn't

24   matter for the purposes of what you are trying to do I guess,

25   Mr. Murrell.

1          MR. MURRELL:  I might give the Court an example.  When

2     we had our detention hearing and I asked the agent who George

3     Soros was he didn't know who he was.  So I think a lot of people

4     do not know who George Soros is.

5          THE COURT:  I'm not disputing that a lot of people

6     don't know who he is, but it doesn't take an expert to say who

7     he is.  So if your point was well, we need an expert to say who

8     George Soros is, I would not allow that as expert testimony.

9     But as I understood it, your point was it doesn't even really

10    matter who he is except that he's the subject of these theories

11    out there.

12         MR. MURRELL:  Again, I'm just trying to show you can't

13    take Mr. Baker's posts at face value.

14         THE COURT:  No, I understand.  So, that leaves the

15    last -- so, anyway to the extent that it's based on the

16    methodology or the qualifications aspects of *Daubert*, the motion

17    to exclude him would be denied, but that does not mean he will

18    be allowed to testify because I think there's a real question,

19    as I indicated at the last hearing, about whether it's just

20    getting too far afield from the issues here.  I mean, you are

21    basically putting in a post and then putting in someone to say

22    that that post shouldn't be taken seriously.  And we can't have

23    a trial about what -- sort of what all goes on out there in that

24    realm.  But that's not a ruling on that.  We'll see what the

25    case looks like at that point.  And so, I think that's the best

1   we can do for right now.

2              Anything further on that one, Mr. Murrell?

3              MR. MURRELL:  That's fine.  And I'm ready for the next

4   witness.

5              THE COURT:  Okay.  Anything further on that, Mr.

6   Fields, or any request for clarification or anything?

7              MR. FIELDS:  No.  Just so I understand, Your Honor.

8   So, the Court is just going to somewhat reserve to see what the

9   evidence looks like at trial and the defense will perhaps raise

10  it again?

11             THE COURT:  That's right.  Or if they try to call him

12  then we can address it then.  But he won't be excluded on the

13  basis that he's not qualified as a political scientist.  And he

14  won't be excluded on the basis that the limited opinions that

15  Mr. Murrell has proffered here that there is a -- within this

16  gentleman's field there is a widespread discussion on the

17  Internet and social media and elsewhere about Mr. Soros and

18  attributing these sort of conspiracy theories to him.  So it

19  won't be excluded based on his methodologies.  It won't be

20  excluded based on his qualifications.  It may or may not be

21  allowed for others reason.

22             So, if we can bring the doctor back and excuse him

23  then we can move to the next witness.

24             MR. MURRELL:  Dr. Enders, we're done.  And thank you.

25  And I'll be in touch with you about the trial next week.

```
 1                THE WITNESS:  Okay.  Thank you.

 2                MR. MURRELL:  Thank you.

 3                THE COURT:  Okay.  And then the other witness?

 4                MR. MURRELL:  I would like to call David Phillips, who

 5     is the next witness.

 6                THE COURT:  Okay.

 7                Mr. Phillips, can you hear us?

 8                THE WITNESS:  Yes, I can.

 9                THE COURT:  Okay.  I don't know which camera you're

10     seeing.  My name Allen Winsor.  I'm the judge presiding over

11     this hearing.  Mr. Murrell is going to ask you some questions

12     here in a minute, but we just want to check the audio.

13                THE WITNESS:  You are so clear, Judge Winsor.

14           DAVID PHILLIPS, DEFENSE WITNESS, DULY SWORN

15                THE WITNESS:  David Phillips, P-h-i-l-l-i-p-s.

16                         DIRECT EXAMINATION

17     BY MR. MURRELL:

18     Q.   Good afternoon, Mr. Phillips.  We meet again via video.

19     I'm sorry we're running a little late, but we'll get right to

20     this.

21           I did want to start by talking about your qualifications.

22     We talked about that some last time before the other judge, but

23     it's important for Judge Winsor to hear about your credentials

24     as well.

25           We do have a copy of your CV that I have given the judge.
```

Direct Examination – David Phillips

1   Is that information in the CV correct?

2   A.   Yes, it is.

3   Q.   I'd like to talk about a couple of the items in terms of

4   employment.  You currently work for Columbia University?

5   A.   Yes, I serve as the director of the program on peace

6   building and human rights.

7              THE COURT:  Just a minute.  Would you repeat that last

8   answer?  We kind of got a little bit of garbled audio there for

9   a moment.

10             THE WITNESS:  Yes, I serve as the director of the

11   program on peace building and human rights at Columbia

12   University.

13   BY MR. MURRELL:

14   Q.   And can you tell us a little bit about what that program

15   amounts to?

16   A.   It's an applied research endeavor looking at conditions of

17   constant and opportunities for promoting peace and stability in

18   hotspots around the world.

19   Q.   I want to also point out your employment at the U.S.

20   Department of State.  It looks like that was for some 14-years

21   beginning in 1999; is that accurate?

22   A.   Yes.  I served as a senior adviser and a foreign affairs

23   expert through the U.S. Department of State during three

24   administrations; the Clinton, Bush and Obama administration.

25   Q.   And, as an adviser what sort of things do you do?  I'm

Direct Examination - David Phillips

1  going to take this mask off by the way.  What is your role?

2  A.   To provide expertise as called upon.  For the Bush

3  administration my focus was on the Middle East.  I worked with

4  the Future of Iraq Project and was involved in matters related

5  to Turkey and Kurdish issues.

6  Q.   You obviously have a lot of expertise that allows you to

7  perform in these positions.  Where does all of this expertise

8  come from?  How did you accumulate this expertise that allows

9  you to serve in these capacities?

10  A.   So over several decades I've been involved in human rights

11  and humanitarian issues.  I'm not an armchair quarterback.  I

12  visit frontlines, interview those who would be directly

13  affected, coordinate closely with U.S. officials and other

14  international officials.  My expertise comes from work in the

15  field.  And it's been accrued over many years.

16          THE COURT:  It's been a what for many years?

17          THE WITNESS:  It's been accrued over many years.

18          THE COURT:  Thank you.

19  BY MR. MURRELL:

20  Q.   I wanted to ask you about some of the books you've written.

21  It looks like you have a current one on peace building, but

22  before that you wrote a book:  Frontline Syria:  From Revolution

23  to Proxy War.  Can you give us a sort of a summary of what you

24  covered in that book?

25  A.   Yes.  That book was published in October of last year.  It

23

Direct Examination - David Phillips

1  was a political and military history of the conflict in Syria.

2  Starting with primarily the Arab Spring and bringing us up to

3  the present, including the defeat of ISIS and the role that the

4  U.S. and Syrian defense forces played to push back the terror

5  group.

6  Q.   In researching and preparing that book, what sort of work

7  did you do?  Can you give us some idea?

8  A.   Yes, I visited Syria on several occasions.  I interacted

9  extensively with Syrians, with Kurds, with Turks and with others

10  directly affected by the events.  I believe that the best form

11  of research involves interacting with persons who are on the

12  frontline.  So I've always emphasized face-to-face and

13  interpersonal contact.

14  Q.   In that same sort of region you have written a book about

15  Turkey Under Erdogan's Dictatorship; is that correct?

16  A.   Yes, that's correct.

17  Q.   And I see you wrote a book about the Kurdish Spring as

18  well?

19  A.   Indeed.

20  Q.   And, of course, you've got a long list of articles that

21  you've got in your CV.  I think you have probably answered this

22  question already, but let me phrase it to you this way:  If you

23  were to describe the methodology you use to produce these books

24  or articles, in a few sentences what would you say?

25  A.   Primary field research, interviews, and studying secondary

24

Direct Examination - David Phillips

1    sources that include news reports.

2              THE COURT:  That include what?

3              THE WITNESS:  News reports.

4    BY MR. MURRELL:

5    Q.   I'm going to ask you the questions I would ask you if we

6    were before the jury to give the Judge some idea of what your

7    testimony would be.

8         The -- this war in Syria that you said began with what you

9    described as the Kurdish Spring, can you tell us --

10   A.   Excuse me.  If I can correct you there, Mr. Murrell?  It

11   began with the Arab Spring.

12   Q.   Right.  I'm sorry.  Thank you for that correction.

13        And, again, we don't need to go into a terrific amount of

14   detail, but how did the war start and what were the issues in

15   the war?

16   A.   Do you want me to go back to the first years of the war or

17   do you want to focus on 2014 and subsequent years?

18   Q.   What I'm mostly concerned about is the role of ISIS.  So

19   maybe start with 2014.

20   A.   So, ISIS emerged during the Arab Spring.  It invaded Iraq,

21   Syria.  There is a town, medium size called Kobani on the

22   Sicilian-Turkish border.  The Kurds and other Kobani residents

23   were attacked.  The YPG People's Protection Units tried to

24   defend the Kurds.  They were outmanned and outmatched until the

25   U.S. intervened.

Direct Examination - David Phillips

1          THE COURT:  Let me stop you.  You said the YPG tried

2    to defend what?

3          THE WITNESS:  Tried to defend the residents of Kobani.

4    BY MR. MURRELL:

5    Q.    Okay.  And, so I was going to stop you there and I was

6    going to ask you, and this is one of the issues that will be

7    important, what is the YPG?

8    A.    The YPG is a group of Kurdish militias that formed during

9    the Syria civil war to protect territories where Kurds reside.

10   And in addition to protecting the Kurds, they also helped to

11   protect other residents in Northeast Syria, including Syrians,

12   Kaufians, Christians, Armenians, and Arabs.

13   Q.    All right.  So they defended -- they defended the area of

14   the city, and what, in terms of the war, what happened from

15   there?

16   A.    Let me see if I can explain what happened in Kobani.

17   80 percent of the city fell.  The suburbs of Kobani were the

18   site of massacres.  Villagers were decapitated and their bodies

19   were mutilated.  Initially the U.S. Government decided that we

20   didn't have a dog in the fight and we wouldn't come to the

21   rescue of the Syrian Kurds.  But then after the beheading and

22   execution of Mr. Foley, a journalist, and others, the Obama

23   administration decided that we should intervene.  If we allowed

24   Kobani to be overrun, its defenders, including many women with

25   the YPJ, Women's Protection Forces, would be executed.  Those

Direct Examination - David Phillips

1    executions would be used to include additional foreign fighters.

2         So the U.S. got directly involved.  We airlifted weapons,

3    medical supplies to the Kurds defending Kobani.  In rather

4    heroic fashion they were able to push back ISIS.  The U.S. had

5    been looking for a partner to fight ISIS in Syria.  The pentagon

6    recognized at that point that the Kurds were highly motivated

7    and capable fighters.  They weren't well equipped.  They weren't

8    well trained, but they had a high degree of motivation.

9         So the U.S. intervened on its behalf providing weapons,

10   money, and logistical support.  The Kurds served as spotters so

11   when the U.S. war planes were overhead they would identify ISIS

12   targets.  And we developed a chain of command to relay that

13   information to CENTCOM, central command.  Kurds were

14   indispensable partners to the U.S.  In Kobani, having realized

15   their capacity, we then expanded our security cooperation.  The

16   Kurds from Kobani pivoted to the east and were --

17   Q.  Can I stop you just a second, Mr. Phillips?  So where is

18   the YPG in all of this?  When you say the Kurds, is that -- does

19   that mean the YPG?

20   A.  Yep.  In 2014 and 2015, when I speak about the Kurds I mean

21   the YPG.

22   Q.  Okay.

23   A.  The U.S. then broadened the force.  It became the Syrian

24   Defense Forces and incorporated some Arab fighters.  But it was

25   really the Kurds who were the point of the spear in fighting

Direct Examination - David Phillips

1   against ISIS after Kobani and (Indiscernible) and then to

2   liberate Raqa, and finally the penultimate battle in Rahul where

3   ISIS was defeated and the U.S. fulfilled its mission.

4   Q.   And I gather from your testimony the YPG played the central

5   role in this?

6   A.   So they were our boots on the ground.  We provided air

7   support.  The hand to hand fighting was done by the YPG and the

8   SDF, Syrian Defense Forces, that incorporated the YPG.  And we

9   shouldn't underestimate the sacrifice that these fighters made

10  at our behest.  There were 11,000 SDF members who were killed.

11  23,000 that were seriously injured.  I think only 9 U.S. service

12  men and women died in Northern Syria.  So they really bore the

13  brunt of the battle.  They were indispensable security partners

14  reliable with a lot of integrity and a lot of fighting prowess.

15  Q.   Given what you've said I think it would be safe to say that

16  the YPG was an ally of the United States in that fight?

17  A.   Oh, for sure.  It was an ally and a security partner.  They

18  were our boots on the ground.  And, we relied on them

19  extensively.  There was a lot of coordination.

20  Q.   How much, in terms of dollars, did the United States

21  contribute to the YPG?

22  A.   Hundreds of millions of dollars.

23       MR. MURRELL:  Thank you.  That's the testimony I would

24  elicit from Mr. Phillips.  Mr. Phillips, the U.S. Attorney's

25  Office may have a few questions for you.

1    THE COURT:  Mr. Phillips, what was the SCF that you

2    mentioned?

3    THE WITNESS:  I mentioned Syrian Defense Forces, the

4    SDF, which was a group of security partners largely populated by

5    Syrian Kurds.  Also including some Syrian Arabs in order to

6    present a nonpartisan approach to our work on the ground.

7    THE COURT:  Okay.  And maybe you said it, but what was

8    the relation between the SDF and the YPG?

9    THE WITNESS:  So, General Mazloum, who was commander

10   in the YPG, became the commander of the SDF.  So they were

11   partners.  They worked together.  The idea was to have an

12   international force that included Kurds but not only Kurds.  It

13   was important to include Arabs so that it was representative of

14   all of the communities affected by the ISIS attacks.

15   THE COURT:  Thank you, Mr. Phillips.

16                      CROSS-EXAMINATION

17   BY MR. FIELDS:

18   Q.   Good afternoon.  Is it -- I'm sorry.  Is it Mr. Phillips or

19   Dr. Phillips?  I want to refer to you appropriately.

20   A.   You can refer to me either way.  I have an honorary

21   doctorate, but I usually go by David.

22   Q.   Okay.  I'll call you Mr. Phillips then.

23        My name is Lazaro Fields.  I'm an Assistant United States

24   Attorney.  I'm going to ask you a couple of questions.

25        You've testified that the basis for your opinion is

29

Cross-Examination – David Phillips

1    interviews, I think field research, and news reports.  Is there
2    anything else other than those three areas?
3    A.    Also my interaction with U.S. officials.
4    Q.    And when you say U.S. officials, are those individuals who
5    are still working for the U.S. government and on behalf of the
6    U.S. government or are those former colleagues of yours?
7    A.    Primarily individuals who are currently serving as U.S.
8    officials.  Active duty U.S. officials.
9    Q.    The interviews and field research that you've conducted, I
10   think you testified that you've interviewed members of the YPG
11   or YPJ in Syria; is that right?
12   A.    Correct.
13   Q.    Just as an example, how many current members of the YPG are
14   there, approximately?
15   A.    Current or at the time?
16   Q.    Right now.
17   A.    So I couldn't give you a number right now.  There were 40
18   to 50,000 members of the YPG during the peak of conflict between
19   2018 and 2019.
20   Q.    Okay.  So of those 40 or 50,000, how many of those -- and
21   strike that.
22        When did you conduct your field interviews and do your
23   field research in Syria with the YPG?
24   A.    In 2018.
25   Q.    So you were there at the peak time when there was about 40

Cross-Examination – David Phillips

1  or 50,000 members of the YPG.  How many of those did you

2  actually speak to?

3  A.   I couldn't give you a head count.  But, you know, I spoke

4  at conferences at the university, interacted extensively with

5  local officials and local security partners.  So my interactions

6  were extensive.

7  Q.   But in terms of you receiving information from members of

8  the YPG, would it be maybe 10 or 15 or a couple of hundred?

9  Could you just give an estimate?

10  A.   Yes, hundreds.

11  Q.   Hundreds.  So you've actually spoken to and received

12  feedback from hundreds of members of the YPG?

13  A.   Yes.  I visited initially.  I met with members of the YPG.

14  I had public conferences and private meetings.  We interacted

15  extensively.

16  Q.   I think Mr. Murrell asked you about your book <u>Frontline</u>

17  <u>Syria</u> that was published last year.  Is your scholarship peer

18  reviewed?

19  A.   Excuse me?

20  Q.   Is your scholarship, including the book that you published

21  last year, was it peer reviewed?

22  A.   It was peer reviewed and also reviewed by U.S. officials on

23  an informal basis.

24  Q.   Who conducted the peer review of your book last year, other

25  than the U.S. officials?

31

Cross-Examination – David Phillips

1    A.    I organized it with colleagues of mine who are

2    knowledgeable about conditions on the ground.

3    Q.    Those are colleagues of yours at Columbia, perhaps?

4    A.    No.  They were colleagues in the United States and

5    internationally who are knowledgeable about the events and the

6    issues.

7    Q.    And you said that there's also U.S. officials that reviewed

8    your scholarship informally.  Could you represent to the Court

9    that U.S. officials that reviewed your scholarship agreed with

10   it?

11   A.    Did they agree with it?  They commented on it.  They

12   critiqued the text.  They suggested improvements to the text

13   which were incorporated into the final version of the book.

14   Q.    Were any of those improvements related specifically to the

15   YPG?

16   A.    They were related to the book in its entirety which

17   addresses, in part, the role of the YPG.  I'll give you an

18   example.  One of the peer reviewers was Ambassador Robert Ford

19   who was the last U.S. ambassador in Syria.

20   Q.    What was his name, I'm sorry?

21   A.    Robert Ford.  And by the way, he wrote an endorsement of

22   the book.  The book was also endorsed by Bill Burns who is

23   currently the CIA Director.

24   Q.    Mr. Phillips, you've also testified that the United States

25   was providing arms and perhaps money, whether in the form of

32

Cross-Examination – David Phillips

1   arms or otherwise, to the YPG; is that right?

2   A.   Correct.

3   Q.   When was that happening and is it still occurring?

4   A.   It began in 2014 with a Battle of Kobani and it is still

5   occurring.

6   Q.   To this date it's still occurring?

7   A.   To my knowledge, yes.

8   Q.   Who is the YPG?  Strike that.

9        Is the YPG currently fighting in Syria?

10  A.   Yes, they are.  They are still the point of the spear and

11  targeting the ISIS remnants.

12  Q.   And is ISIS their only entity that they are fighting or are

13  they fighting any other entities?

14  A.   They are fighting ISIS at our request.

15  Q.   Are you aware of anybody else in this area of expertise of

16  yours who disagrees with your opinion as to who the YPG is in

17  active conflict with?

18  A.   Am I aware of persons who disagree?  There is some

19  scholarly debate about different issues, but I'm not aware of

20  persons who disagree.

21  Q.   Okay.  Are you aware that some individuals, including the

22  former representative of the United States to Syria, that says

23  that the YPG is in conflict with other entities such as the

24  Turkish government?

25  A.   No.  They are not in conflict with the Turkish government.

1          THE COURT:  That wasn't the question.

2          THE WITNESS:  What was the question there?

3          THE COURT:  The question was whether you are aware of

4  others, including former representatives of the United States to

5  Syria, that some of them have said that YPG is in conflict with

6  the Turks?

7          THE WITNESS:  So, Turkey has sent troops across the

8  border.  They have established a security belt in Northern

9  Syria.  U.S. officials negotiated the withdrawal of YPG forces

10 obviating the potential for violent conflict between Turkish

11 forces coming in and YPG forces that were coming back.

12 BY MR. FIELDS:

13 Q.  Mr. Phillips, I'm going to try to simplify it, are you

14 aware that other individuals have stated, including current and

15 former officials of the U.S. government, that YPG is in active

16 conflict with the Turkish government?  Are you aware of that

17 fact?

18 A.  I dispute that fact.  No, I'm not aware of anybody saying

19 there is an active conflict.

20 Q.  Are you aware of any current or former United States

21 officials, or anyone else, who says that the YPG was at any

22 point in human history in active conflict with the Turkish

23 government?

24 A.  No, I am not.  They were not in conflict with the Turkish

25 government.  They were in conflict with ISIS at our request.

34

Cross-Examination - David Phillips

1  Q.   Mr. Phillips, would you agree with me that the Turks,

2  Turkey, the Republic of Turkey, is an ally of the United States?

3  A.   Turkey is a NATO member.  However, Turkey under President

4  Erdogan has become Islamist anti-democratic and hostile to human

5  rights.  So if Turkey applied to join NATO today its membership

6  application wouldn't even be considered.

7            MR. FIELDS:  May I have one moment, Your Honor?

8            THE COURT:  Yes.

9            MR. FIELDS:  Nothing further, Your Honor.

10            THE COURT:  Mr. Murrell, anything else?

11            MR. MURRELL:  I don't have any other questions.

12            THE COURT:  I have a question.  You had said your

13  opinion is that -- I guess you really present more of a fact,

14  but that the YPG is an ally of the United States.  And you

15  talked generally about your methods of supporting your opinions.

16  When we talk about that opinion specifically, the YPG's

17  relationship or alliance with the United States, how did you

18  come to that view?  I mean, was that from talking to people over

19  there who were fighting with YPG?  Was that from your

20  interaction with former government officials?

21            THE WITNESS:  Let me add one item to my previous

22  response.  Turkey has spent $2.5 billion to purchase S-400

23  surface to air missiles from Russia.  The U.S. has strongly

24  objected to that and suspended Turkey's participation in the

25  F-35 Stealth Fighter Program.  The fact that Turkey broke NATO

Cross-Examination - David Phillips

1  protocol by buying sophisticated weapons from Russia is another

2  source of concern.  So I think I didn't answer your most recent

3  question.  Could you rephrase that for me?

4          THE COURT:  Well, before we do that, what he just said

5  in response to your last question, Mr. Fields, do you have any

6  follow-up on that?

7          THE WITNESS:  Let me also add that by virtue of

8  Turkey's purchase of the S-400's U.S. law requires sanctions on

9  Turkey.  So the Countering American's Adversaries Through

10  Sanctions Act kicked in.  There are now sanctions on Turkey

11  which are being intensified.

12          MR. MURRELL:  I might object.  I don't know why we are

13  really talking about Turkey.  We have other things to do today.

14  And we could spend the rest of the day here defending these

15  irrelevant issues.  I don't think Turkey plays any role in this.

16          THE COURT:  Well, here's why I'm going to overrule

17  that objection.  The opinion that you want to put on is that the

18  YPG was allied with the United States, correct?

19          MR. MURRELL:  (Indicated an affirmative response).

20          THE COURT:  Right?

21          MR. MURRELL:  Yes, sir.  And I don't know how else you

22  could say that when you look at how much money and weapons the

23  U.S. gave.  Again, I don't think this is particularly

24  controversial.  There is some debate about Turkey, fine.  But I

25  just don't think that's central to the -- to what I'm trying to

36

Recross-Examination - David Phillips

1    present here.

2            THE COURT:  I'm sure that the Turkey aspect of things

3    isn't, but the question that Mr. Fields asked was whether other

4    people disagreed with some of what he's come up with here.  And

5    there's real questions about how he's coming up with what he's

6    saying, which is the purpose of this hearing.  I asked the

7    question I asked, which we'll get an answer to hopefully in a

8    minute, and the stuff about Turkey, I agree, would have no place

9    at trial, but it does go I think to the issue that we are here

10   today on.

11           I -- as I indicated at the previous hearing, I'm not

12   sure that YPG's relationship with the United States has anything

13   to do with any of the facts because the relevance of the

14   defendant's participation with that group has to do with his

15   weapons training and willingness to fight and things like that.

16   But we're here to determine whether this expert meets the

17   *Daubert* standard.  And I think the answer to these questions are

18   relevant to that.  So I'm going to overrule the objection.

19           And, Mr. Fields, did you have follow-up questions?

20           MR. FIELDS:  One, Your Honor.

21                        RECROSS-EXAMINATION

22   BY MR. FIELDS:

23   Q.   Mr. Phillips, if I heard you correctly you said that the

24   Turkish government purchased millions of dollars worth of

25   missiles from the Russian government; is that right?

37

Recross-Examination - David Phillips

1    A.    Actually a billion dollars worth of missiles.

2    Q.    Okay.  Billions of dollars of missiles.  And I think you

3    also said that the United States government was upset about it

4    and there are sanctions as a result?

5    A.    That's correct.

6    Q.    And where are you getting this information from?

7    A.    Published reports.

8    Q.    Can you give us an example of a few?

9    A.    Washington Post, the New York Times, the Financial Times.

10   There are voluminous reports about Turkey's purchase of weapons

11   from Russia and how the U.S. reacted, disapproved, and then

12   implemented sanctions through CAATSA.

13   Q.    So is it your testimony that Turkey is an enemy of the

14   United States?

15            MR. MURRELL:  Judge, I have to object.  I just think

16   we're really getting very far afield.  It seems to me a waste of

17   time.

18            THE COURT:  It's overruled.  You can go ahead.

19            THE WITNESS:  Want me to answer that question?

20            THE COURT:  Yes, please.

21            THE WITNESS:  No.  Turkey is not an enemy of the

22   United States.  But nor is it a reliable ally.

23            MR. FIELDS:  Thank you, Judge.

24            THE COURT:  Okay.  And then my question, sir, was,

25   your view that the YPG is an ally of the United States, the

Recross-Examination – David Phillips

1   question is, where do you get that?  And you talked more broadly

2   at the outset of your testimony about how you came up with your

3   opinions generally.  And you talked about meeting with people on

4   the ground in Syria, you talked about meeting with government

5   officials.  And as I interpreted your testimony you were talking

6   about that's how you came up with all of your opinions

7   generally, but the specific opinion about YPG's relationship

8   with the U.S. government, what's the basis for that opinion?

9   That's the question.

10       THE WITNESS:  The fact that we provided weapons to

11  them, that U.S. special forces work side by side with YPG

12  members to identify targets, and call in bombing sorties and

13  hundreds of millions of dollars that the U.S. has provided to

14  support YPG operations.

15       THE COURT:  Okay.  Thank you.  Anything further from

16  either side?

17       MR. MURRELL:  Nothing for the defense.

18       THE COURT:  Okay.  Thank you, sir, for participating

19  today.

20       MR. MURRELL:  Can I just say goodbye?  Thank you,

21  Mr. Phillips.  I'll contact you later in the week about the

22  trial.

23       Thank you.

24       THE WITNESS:  Okay.  Thank you, gentlemen.

25       THE COURT:  Okay.  I'll hear brief argument from

1   either side.  And, again, the witness is excused, whoever is

2   controlling the --

3           MR. MURRELL:  Well, again, I don't think you could

4   find anybody better qualified.  We can debate about Turkey and

5   so on, but that's really not the thrust of what I expect to

6   present.  When we get to the government's exhibits you will see

7   there is a great deal of emphasis on YPG.  There's a photo

8   that's zeroed in on the YPG patch that apparently was found at

9   Mr. Baker's residence.  So that sort of goes to whether it's

10  relevant, but we can talk about that later.

11          THE COURT:  Well, let me ask this question:  There was

12  a lot of discussion today about other things, but you said when

13  you stood up a moment ago that it's obvious that YPG is an ally

14  because they are receiving a lot of money from the United

15  States.  Assuming that fact is true, I think that's a logical

16  inference from it that they are allies.  Typically, governments

17  don't fund the enemies.  But, I asked him how he came up with

18  that view and he said basically the same thing, he's basically

19  just citing facts that either are facts or aren't facts.  They

20  gave money, they, you know, whatever else he said.  And I'm not

21  sure that's an appropriate area for expert testimony.

22          In other words, if there is some other evidence that

23  the government is funding this or that, assuming that the issue

24  of whether this organization is or is not an ally is a material

25  issue at all, which I have very serious doubts about, but why

1  would the jury need to hear from someone who is just going to

2  say:  I read financial reports when I worked for the Department

3  of Defense and I know that -- or the Department of State.  That

4  just doesn't sound like expert testimony to me.

5        MR. MURRELL:  Well, I would suggest it is.  You know,

6  I can, I didn't bring the case with me.  But, I mean, he's

7  obviously an expert on the war.  He wrote a book about it.  He

8  goes there.  He has talked to YPG members.  He has talked to

9  government officials.  And he read reports and studies.  I think

10  that qualifies him as an expert.

11        Now, how do you know that the government gave the YPG

12  hundreds of millions of dollars or how do you know that they

13  called in air strikes?  Well, if the requirement is you have to

14  be there when they call in the air strike it's going to be

15  awfully hard to find an expert.  I think you can call on people

16  like Mr. Phillips who are scholars, who write books about this,

17  who write articles, who go to the area and to meet with

18  officials and to talk to government officials.  I think you can

19  call people like that to testify and explain a bit about the

20  history of the war and a bit about who the YPG is.  So, I think

21  he's --

22        THE COURT:  But the history of the war is, just like

23  you were jumping up a moment -- I shouldn't have said that, but

24  you are saying that that gets far afield.  The history of the

25  war certainly gets far afield.  Your point is you don't want the

```
 1   jury to be left with an impression that he's with a terrorist
 2   organization.  And your next point is that we know that YPG is
 3   not a terrorist organization because they receive funding from
 4   the United States.  And my question is, why is that an area for
 5   an expert, the level of the funding and things like that?
 6              MR. MURRELL:  I don't know who else would talk about
 7   it.
 8              THE COURT:  But you were talking about scholarship
 9   and, I mean, it's just -- you don't have to have a scholarship
10   to know a fact about whether the --
11              MR. MURRELL:  Well, my initial thought was, Well, this
12   isn't really expert testimony.  And my suggestion was he could
13   just testify because he knows about it.  And then the government
14   says, Well, no, he's got to be an expert.  And I do think the
15   Rule 702 talks about specialized knowledge.  And I think he does
16   have specialized knowledge.  So that's why I think it's the
17   subject of expert testimony.
18              THE COURT:  Well, okay.  Mr. Fields?
19              MR. FIELDS:  Your Honor, I'll just -- for purposes of
20   argument I'll agree that he's qualified to discuss this general
21   subject matter.  More specifically as to the reliability of it,
22   he's spoken to hundreds of YPG members.  He's spoken to U.S.
23   officials.  He was formerly, at least seven or eight-years ago,
24   a U.S. official.  I don't know -- I think he's probably more
25   reliable than Mr. -- our last expert, but I think really here
```

1     it's the helpfulness to the jury which is really, for me, and

2     for the government, the concern which is, this is going to get

3     into a side issue that, quite frankly, Your Honor, I just don't

4     think that the Court needs to get into it.

5               THE COURT:  Well, in light of -- if you're saying you

6     are not contesting the reliability or his expertise then it will

7     be the same ruling as before and we'll reserve on the issue of

8     relevance and how that fits in here.  Based on what you said,

9     there's really nothing else to do now at this point; is that

10    right?

11              MR. FIELDS:  Yes, Your Honor.  And perhaps this will

12    be fleshed out more when we talk about the exhibits and such,

13    but I think the issue would be beneficial to both sides to have

14    some sort of discussion on what we expect will happen as it

15    relates to the YPG, the Turkish government, the terrorist area.

16              THE COURT:  Okay.  Well, we'll talk about that next.

17    But for now that will be the same ruling as the other, as Dr.

18    Enders.

19              Certainly, if the government puts in anything that

20    suggests that he was working for a terrorist organization and he

21    has evidence that the organization he was working for was not a

22    terrorist organization that would be fair game.  But, again, if

23    there is -- if the government doesn't say what it does and

24    you're just arguing, Mr. Murrell, that, well, you fear a jury

25    might think this or that based on what jurors might think then

```
1   we'll be in a different situation.
2           MR. MURRELL:  I might just say this real quick.
3           THE COURT:  Yes, sir.
4           MR. MURRELL:  I don't think the government will do
5   that, but I think the government is going to emphasize the fact
6   that he fought with the YPG.  So the question is, well, why is
7   that important that he fought with the YPG.
8           THE COURT:  Okay.  Let's talk about the 404 issues.
9   There was a government's filing that indicated maybe that had
10  been narrowed somewhat or there was some agreement.  Do we know
11  where the disagreement is?
12          MR. MURRELL:  Well, yesterday the government was good
13  enough to send me copies of all of -- their total exhibits.  We
14  got probably 50.  And I have copies of them, which was very
15  helpful.  I guess -- 35 I guess.  Some have multiple parts.
16          At any rate, I think it's a matter of just going
17  through the exhibits.  There are certainly some I don't have any
18  objection to, but there's some I do.
19          THE COURT:  Okay.
20          MR. MURRELL:  I don't know if the Court has the
21  exhibits.
22          THE COURT:  I do.  I did go through the exhibits.
23  We'll go through them now.  One thing I wanted to address with
24  you, Mr. Murrell, we had had this discussion before about the
25  sufficiency of the 404 notice.  I think a lot of the exhibits,
```

1    and you may agree, are intertwined and not 404 issues, but to

2    the extent there are 404 issues and there's going to be an

3    alternate ruling on that, do you feel like you have the notice

4    that you --

5          MR. MURRELL:  I don't have any complaints about the

6    notice or filling the obligation of the rule.

7          THE COURT:  Very good.  The other thing I wanted to

8    say, I went back and was revisiting what we did last time, and

9    specifically your proffer as to the law enforcement officers.

10   The motion to compel was denied based on what I said then, which

11   is there's a -- as to the objective reasonable person standard,

12   it wouldn't matter what was not known to the public.  And I do

13   stand by that ruling.

14         There was something in your proffer about what was

15   communicated to the public.  And I note you filed in your

16   exhibit list some articles and things like that.  I do want to

17   make clear, and I maybe didn't make this as clear at the

18   previous hearing, I think there is a difference between what was

19   known to the public at that time the statements were made, which

20   I think does go into the context versus things that were in the

21   news that would go to the context, the overall context just like

22   the other posts would and things like that.  So does that make

23   sense or do you have any follow-up questions or seek

24   clarification on that, Mr. Murrell?

25         MR. MURRELL:  Well, it does.  I guess I wonder where

1   that leaves us with regard to the subpoenas.  Nobody will talk

2   to me at the police department so it's hard for me to know

3   exactly what they disseminated.  Same is true for the sheriff's

4   office.

5           You will see in my exhibit list I have listed the

6   article from the Tampa Bay Times that came out January 12th, the

7   day that Mr. Baker posted his threat.  Or I shouldn't say

8   threat, he communicated the call to arms.  And that does say

9   that -- it talks about what I would expect the officers to say.

10  But, again, nobody will talk to me at the police department, so

11  I don't know what information they might be able to tell the

12  Court about what they disseminated to the public.

13          THE COURT:  Mr. Fields or Mr. Kunz, on that, I mean,

14  you agree there is -- I assume the government's going to have

15  evidence about what was known to the public at the time for the

16  context, including the events of January 6th and so forth?

17          MR. KUNZ:  Yes, Judge.  And actually in one of the

18  exhibits the defendant posted one of those flyers that were sent

19  around as to what Mr. Murrell was arguing.  You know, either

20  didn't exist or wasn't informed or was a figment of someone's

21  imagination.  And it's included in one of the exhibits, Judge,

22  with respect to that.

23          So, again, what he asked the Court for last week, and

24  as we understood it, Judge, as to him opposing our motion to

25  compel, was that this is never going to happen and everyone knew

1    that.  Well, the defendant thought it was going to happen.  In

2    fact, he posted it, Judge.  He sent it to someone else.  I think

3    that's what's important, Judge.

4            THE COURT:  Right.  And I guess the question is, maybe

5    we'll answer it as we go through these exhibits, but the overall

6    context includes things separate from what he posted or alluded

7    to in his post just that there was a sort of national concern

8    about what might happen at state capitols and things like that.

9    Those are things that I assume you would seek to introduce,

10   maybe I'm wrong about that, but I think that makes the overall

11   things that public officials were communicating about, we are

12   ready or we are not ready or we don't think something is going

13   to happen, that would all go into the context and be appropriate

14   considerations for the jury, but tell me if you disagree.

15           MR. KUNZ:  Judge, I don't think we necessarily agree

16   that what the officials were doing or not doing --

17           THE COURT:  I'm not talking about what they were doing

18   but what was being said and what was -- in other words, this

19   would be a whole different case if you took away the events or a

20   different factual presentation I should say, not a different

21   case, it would be different considerations for a jury if this

22   would have happened -- the same statements would have been made

23   three-years ago, right?

24           MR. KUNZ:  Yes, sir.  Different set of facts, but the

25   fact that, you know, the local police did or did not say

1    something about potential threats in no way, from our

2    perspective, Judge, respectfully, affects the intent of what he

3    did when he was posting this based on what his knowledge was,

4    his understanding, and what would reasonable jury would

5    understand to be a threat.

6           THE COURT:  Well, his intent is one aspect of it and

7    what a reasonable person -- how a reasonable person would

8    receive that statement is a separate issue, right?

9           MR. KUNZ:  Yes, sir.

10          THE COURT:  Okay.  And as to that second inquiry,

11   wouldn't what a reasonable person knew at that time about sort

12   of the affairs of the world matter?

13          MR. KUNZ:  Judge, I think what they know about, but

14   whether law enforcement told them that this was a serious threat

15   or not a serious threat, or my point is -- let me say it in a

16   reverse way.  If, in fact, law enforcement didn't take this as

17   serious I don't think negates a reasonable person interpreting

18   this as a threat.

19          THE COURT:  Maybe not, but it would be a

20   consideration, wouldn't it?  And, again, I'm not talking what

21   they thought behind the scenes, but if there was a communication

22   that said:  We encourage all citizens to be on alert on this day

23   because we're very concerned about the following happening,

24   which we've had happen from time to time, wouldn't that effect

25   the way a reasonable person would receive or interpret the

1    statements that are at the issue of this case?

2           MR. MURRELL:  I think it may well, Judge.  But, again,

3    talk about facts in this case, there was every indication that

4    there was a concern of law enforcement to the threats of all

5    state capitols, and what have you.

6           THE COURT:  Right.  So that's relevant, correct?  And

7    I assume the government is going to put in evidence to that

8    effect, correct?

9           MR. KUNZ:  Yes, sir.

10           THE COURT:  Okay.  Go ahead.

11           MR. KUNZ:  My whole point was, counsel, you know, his

12    argument on this motion to compel and this defense is that this

13    was never going to happen, it was ridiculous.  Even the local

14    officials weren't putting out specific warnings.  Our point,

15    Judge, is they may not be putting out specific warnings, but

16    that won't effect, you know, A, the defendant's intent but, B,

17    you know, is it reasonably, you know, objectively to a

18    reasonable person looking at it.

19           THE COURT:  Okay.  I hope maybe this will be more --

20    there will be more clarity as we go through these exhibits, but

21    I'm not sure that you and I are necessarily saying different

22    things.

23           Anything else before we turn to the exhibits, Mr.

24    Murrell?

25           MR. MURRELL:  No.  I just want to make sure by the

1  time we are done today where my subpoenas stand.

2          THE COURT:  Well, and what we did before the ruling

3  was that we were treating it as a motion in limine to exclude

4  evidence of the type that was the subject of your motion to

5  compel, about what they were doing or what they thought was

6  going to happen, those confidential assessments and things like

7  that.  If you are talking about public communications I think

8  that's something different.

9          MR. MURRELL:  I understand.  But, again, as the Court

10  said, part of what I want to present is what the law enforcement

11  was disseminating to the public.

12          THE COURT:  Well, that would be the only part that I

13  think wouldn't have been excluded by the other ruling.

14          MR. MURRELL:  Yes.  Given your ruling, yes, sir, I

15  agree.  But, again, that was one of the reasons that I sent the

16  subpoena was to talk about what information they had

17  disseminated to the public.

18          THE COURT:  Okay.  Well, I'll clarify the ruling.  And

19  I should have made this clear before.  I found the government

20  didn't really have standing to quash the subpoenas, but that the

21  testimony as I interpreted it at the time that you were seeking

22  would be excluded and that would sort of resolve the issue.  But

23  if you're seeking other testimony, other than what was the

24  subject of the motion to compel, and other than what was

25  excluded by the previous ruling, that is, things that was other

```
 1    than what was publically disseminated, that won't be allowed.

 2    But if you subpoenaed them for other reasons and that can be

 3    addressed, I mean, if someone moves to quash them on that basis

 4    or the basis that the government was asserting burden and things

 5    like that we can address that between now and then.

 6              MR. MURRELL:  So should I tell the witnesses that the

 7    subpoenas are still legit?

 8              THE COURT:  You may, yes.

 9              MR. MURRELL:  Okay.  Thank you, Judge.

10              THE COURT:  But, again, I mean, the subpoenas don't go

11    to a topic.  The subpoenas go to the person.

12              MR. MURRELL:  No.  I'm assuming somebody will call

13    them from the sheriff's office and the police department and we

14    can talk and I can find out if they actually have some relevant

15    information.  I mean, I have reason to believe they do, given

16    that news article, but that --

17              THE COURT:  Given which news article?  It was attached

18    to your motion?

19              MR. MURRELL:  Yeah, I attached it to the motion.  And

20    it's actually the same one that's listed on my exhibit list.

21              THE COURT:  I thought that was a Tampa article.

22              MR. MURRELL:  Pardon?

23              THE COURT:  I thought that was a Tampa article.

24              MR. MURRELL:  They are both Tampa Bay Times.

25              THE COURT:  But it references Tallahassee?
```

1          MR. MURRELL:  Yes, it does.  It does, yes.

2          THE COURT:  The city or the police department?

3          MR. MURRELL:  The police department.

4          THE COURT:  All right.  Just a moment.

5          MR. MURRELL:  I say that.  I don't have the article in

6     front of me, but I think my memory is correct.

7          THE COURT:  And your response is not where the

8     document -- the article was.  Number 47.

9          MR. MURRELL:  It was attached to the -- I guess it was

10    attached to the motion to compel.

11         THE COURT:  Oh, you're right.  Document 42.  Okay.

12    Your memory is correct, Mr. Murrell.  It does mention --

13         So are we ready to go through the exhibits?

14         MR. MURRELL:  I am.  Yes, sir.

15         THE COURT:  Which is the first one that there's an

16    issue with, Mr. Murrell?

17         MR. MURRELL:  Well, no objection to 1A.  No objection

18    to 1B.  No objection to 2A.  No objection to 2B.  I would say

19    Exhibit 3, the certificate of release or discharge from active

20    duty, we spoke about that briefly the other day, but the one

21    that shows that he was discharged for less than honorable

22    conditions.

23         THE COURT:  And the only thing on that that's in issue

24    is that statement; is that right?

25         MR. MURRELL:  I'm looking.  I believe that's the only

1    section that -- only portion that I would find objectionable.

2          THE COURT:  Mr. Kunz, any reason why that actual

3    reason for his discharge is relevant other than the fact, I

4    mean, aside -- the fact that he left the United States military

5    and went to work abroad is obviously relevant.  But --

6          MR. KUNZ:  Judge, Your Honor, our position is that it

7    explains the reason why he joined basically a foreign militia.

8    He went from 2008, after he was discharged from the Army, until

9    2018.  And it kind of explains this, Judge; he was obviously

10   upset with this because of his conduct and he owed a signing

11   bonus to the Army.  We're not putting those documents in, Judge.

12   But the way he was separate and when he was interviewed by

13   agents he told them why he went to work, why he joined YPG,

14   including his other than honorable discharge.

15          And as I think Mr. Murrell argued last week, he didn't

16   want to stay in the Army because he thought they were doing bad

17   things when he was supposed to be going over to Iraq and fight.

18   So our feeling, Judge, is it should be admitted to show the

19   context of why he joined the YPG, according to his own words,

20   and this confirms what he says.

21          THE COURT:  Right, but what -- the reason why he

22   joined YPG bears on what element in this case?

23          MR. KUNZ:  Well, in terms of, not an element, Judge,

24   but in terms of context.  This goes to -- they are inextricably

25   intertwined.  It shows the context of where he was in the Army,

1  why he didn't join the Army for training.  He did join the Army

2  and got training.  And then additionally then he goes to a

3  foreign military, foreign organization.  And this just explains

4  why there was a gap from 2008 to 2018 and all of this other

5  activity that goes on.

6          THE COURT:  Well, the gap is explained by the fact

7  that he did leave the military.  I guess I'm not following.  If

8  the relevance of his participation in YPG is the fact that he

9  had weapons training, correct?

10          MR. KUNZ:  Right.

11          THE COURT:  And how is that changed or diminished or

12  enhanced by the fact that he was dishonorably discharged as

13  opposed to honorably discharged?

14          MR. KUNZ:  Well, again, Judge, part of our theory is

15  that he was upset with the U.S. Army.  And he went on as he told

16  the agents when he was arrested, I guess he was homeless for a

17  number of years, and I didn't like what was happening there, I

18  lost all this money and then I went and joined the YPG.

19  Obviously, it's relevant, Judge, for, again, military training

20  and for about a year or so when he was shipped out he went AWOL.

21          Again, our feeling, Judge, is that he didn't just get

22  training in one organization.  He also got training from the

23  U.S. Army as well.  And all of that should be relevant.  And,

24  this is a person who, through his posts and everything else, it

25  escalated, Judge, until he finally did these threats.  And this

1    is the starting point for some of that activity.

2              THE COURT:  Mr. Murrell?

3              MR. MURRELL:  I think it's a little farfetched.  We

4    are happy to stipulate he was in the Army and what period of

5    time and so on.  And why he joined the YPG, I don't know what

6    that has to do with much of anything to tell you the truth.

7              Again, to me it shows bad character and there is no

8    relevance and certainly any relevance is outweighed,

9    substantially outweighed by the unfair prejudicial value.

10             THE COURT:  Well, I don't know that I need to address

11   the 403.  I don't see the relevance of the dishonorable

12   discharge.  The relevance of the military training at all is the

13   weapons training, the same with YPG.  So, I guess 3 would be

14   just redacted to exclude the dishonorable discharge, but

15   otherwise you're not taking issue with the fact that he was

16   discharged, correct, Mr. Murrell?

17             MR. MURRELL:  No.  That's fine.  I guess as you were

18   talking about it, they could just white out that section and

19   introduce this document.  But I guess for those in the know

20   might realize that there should be something there and if it's

21   whited out then --

22             THE COURT:  Well, we can't put it as honorable if it

23   wasn't.  I mean --

24             MR. MURRELL:  Pardon?

25             THE COURT:  I mean, where does that leave us?

 1          MR. MURRELL:  I'll be happy to stipulate that he was

 2   in the Army and what period of time he was in the Army and if

 3   you need to talk about whatever training he received.  It seems

 4   that would solve the problem.

 5          THE COURT:  Is there any relevance to this document

 6   aside from the nature of this charge, Mr. Kunz?

 7          MR. KUNZ:  No.  Just the time really with respect to,

 8   A, that he was in the service from one point, one year and

 9   three-months infantry training.

10          THE COURT:  Okay.  Well, if you all stipulate to that

11   then that wouldn't need to come in.  If you don't, then it would

12   come in in a redacted form.  What's the next one you have an

13   issue with, Mr. Murrell?

14          MR. MURRELL:  We've got some Facebook records, 4A and

15   5A, showing a connection between Facebook.

16          THE COURT:  Okay.  And you do not object to those?

17          MR. MURRELL:  No objection to those.  Going through

18   6C, I don't have any objection.

19          Exhibit 7 I guess would be my next objection.

20          THE COURT:  Okay.  What's the objection there?

21          MR. MURRELL:  Well, this goes back to 2018.  He tells

22   me it wasn't even operational.  They were training with these

23   guns that were not operational.  This just goes back to the YPG.

24   Again, he was in the YPG.  And then we have a picture of him in

25   some meditative position with the gun behind him.

1          THE COURT:  The presence of the gun makes it relevant.

2    I mean, you have just a 403 argument, that's the whole of it?

3          MR. MURRELL:  Yes, sir.  I mean, if we have

4    information that he has trained, I mean, to me this is just

5    overkill.

6          THE COURT:  Okay.  As to 403 it's overruled.

7    Certainly, the volume of these types of posts I think goes to

8    the relevance of whether he had a subjective intent to do

9    anything like this.  So that's overruled.

10          You didn't have any objection other than 403 on number

11    7?

12          MR. MURRELL:  No, sir.  Same goes to 8.  I think that,

13    it's hard to make it out, but Mr. Baker tells me that he has

14    some grenades here in his hands.

15          MR. KUNZ:  It didn't come out real good, Judge.  But

16    the actual exhibit is clear.

17          THE COURT:  Okay.

18          MR. MURRELL:  Well, at any rate, again, I don't know

19    how many pictures we're going to have with him with guns and

20    weapons, but at some point it's overkill and in my view it

21    certainly outweighs the value.  Here again, we got him in a YPG

22    uniform.  All of this emphasis on being in the YPG, it's going

23    to convey to the jury that is some significance and something

24    important about the fact he was in the YPG, not just training,

25    particularly when he have 10 or 15 photos of him with the YPG.

1          THE COURT:  Okay.  All right.  So it's just 403 as to

2    number 8?

3          MR. MURRELL:  Yes.

4          THE COURT:  That's overruled as well.

5          MR. MURRELL:  The next one 9A, I suppose the value of

6    it, he quotes someone who, if I remember right, was the female

7    commander of the YPG.  Fine.  And then we got this business

8    about him being a squad designated sharp shooter, and YPG blue

9    belt and Brazilian jujitsu.  And, again, I don't know how much

10   time we're going to spend on the YPG and the fact that he fought

11   with them.  But I think this is frankly irrelevant, but

12   certainly it's the value of 403.

13         THE COURT:  Well, it's certainly relevant.  I mean,

14   he's saying -- it's indicating he's a sharp shooter.  It relates

15   to YPG, which I think we all -- I thought we all agreed was

16   relevant.  So, to the extent it's a relevance argument it is

17   overruled.  And as to the 403 it will be overruled for that as

18   well.  I mean, it is relevant.  Prejudice is not -- there is no

19   unfair prejudice that's substantially outweighed.

20         MR. MURRELL:  9B, I suppose, I'm not sure why it's

21   admissible.  I suppose maybe the government wants to show that

22   he has 3,000 friends on his Facebook page.  I suppose that's

23   okay.  So I would not have any objection to that.

24         THE COURT:  To 9B?

25         MR. MURRELL:  Right.  9C is a photo of his beret and

1    his badge for the YPG.  Here again, I don't know how many photos

2    we're going to have that shows he is in the YPG.  I'm going to

3    start counting them here in a minute.  I just don't know how

4    many times we have to tell them that he was in the YPG.

5              THE COURT:  These were taken from the search warrant,

6    is that what they were?

7              MR. KUNZ:  They were taken from a bag when he was

8    trying to get on the plane in Tampa, Judge.  And this was in

9    January of 2020.

10             THE COURT:  So how did they come to be again?  He was

11   getting on a plane and TSA or somebody took these pictures?

12             MR. KUNZ:  Well, yeah.  They went through security,

13   Judge, and they started checking him.  And he agreed to have it

14   searched.  And these items, including one of the items, Judge,

15   9G is actually one of the firearms that was seized, the same

16   firearm that he had when he was arrested.  This is that firearm,

17   Judge.

18             THE COURT:  Okay.

19             MR. MURRELL:  Again, I guess he was flying from Tampa

20   to Nashville when these photos were taken.

21             MR. KUNZ:  Yes, sir.

22             THE COURT:  All right.  And the objection to 9C --

23   well, give me the range of 9 that you're objecting to, Mr.

24   Murrell.

25             MR. MURRELL:  I'm sorry?

1          THE COURT:  Give me the various subparts of number 9

2  that you're --

3          MR. MURRELL:  9C, I object to that.  That's the one

4  with the beret and the YPG badge.  That's 403.  9D, I can't

5  imagine what the value of that is.

6          THE COURT:  I can't tell what it is.

7          MR. MURRELL:  It's hard to make it out.  Mr. Baker

8  tells me this is a fellow that was killed fighting in Syria.

9          THE COURT:  Is that a T-shirt?

10          MR. MURRELL:  It's a T-shirt.

11          THE COURT:  With some graphics on it?

12          MR. KUNZ:  It has a rifle, Judge.

13          THE COURT:  Are the graphics bad on this printout or

14  are they bad on the T-shirt?

15          MR. KUNZ:  On the print.  It's a small photo, Judge.

16          THE COURT:  This is something that was -- all of these

17  were taken at the airport?

18          MR. KUNZ:  Yes, sir.

19          THE COURT:  All right.  So the objection is just 403,

20  Mr. Murrell?

21          MR. MURRELL:  A, I don't think it's relevant at all

22  that he was wearing a T-shirt with some guy that has, it looks

23  like a rifle maybe.  But, also 403.

24          THE COURT:  What's the relevance of it, Mr. Kunz?

25          MR. KUNZ:  Judge, this is consistent with what his

1    intent was when he ends up, you know, he puts the AK-47, the

2    call to arms, everything else, all of this stuff going on Judge

3    shows he's somebody who is going to do it, it's going to fit in

4    with his posts when he's talking about shooting up things and

5    what have you, again, goes to his intent, was this a true threat

6    in January.

7              THE COURT:  Well, I guess my question is, is there

8    anything specific about the shirt or is it just that it has a

9    person with a gun on it or there is some writing on here that I

10   don't know the significance.

11             MR. KUNZ:  Judge, at this time he made a statement to

12   TSA about being a killer, he enjoyed being a killer.  And this

13   just corroborates what he's saying in terms of the --

14             THE COURT:  Because of the picture or because of the

15   words?

16             MR. KUNZ:  No, Judge.  The photo is just consistent

17   with it, with the firearm, something with a firearm and a vest

18   and what have you.

19             THE COURT:  Okay.  Overruled as to 9D.  9E, I assume,

20   is just the same as 9C?

21             MR. MURRELL:  Another reminder that he was with the

22   YPG and certainly conveys that there was something sinister

23   about it.  But, again, how many times do you have to tell them

24   he was in the YPG.

25             THE COURT:  Okay.  This appears to be a uniform or

1    something.  It's got an airborne patch on there.  That's

2    overruled.  I think that's relevant and not subject to 403

3    exclusion.

4              9F, do you object to 9F?

5              MR. MURRELL:  No.  That's a medics kit.  We don't have

6    any objection.  9G, I don't have objection to that.  9H, serial

7    number on the firearm.  9I, I'm not sure of the relevancy of it

8    other than maybe to show that this was Mr. Baker's luggage.  No

9    objection to that.

10             THE COURT:  Okay.

11             MR. MURRELL:  I've got a --

12             THE COURT:  The next one I have is number 10.  That

13   was the end of the 9's there, 9I.

14             MR. MURRELL:  The page I have that says, business

15   record page 2789 at the top.

16             THE COURT:  There is 2788 that I have that comes

17   before that.

18             MR. MURRELL:  Oh, I see.  They are out of order.

19   Okay.  Well, here again, so here is a photo with the YPG.  And I

20   guess I see the next page explains it.  Again, 403.  We got 10

21   pictures so far showing he was in the YPG.

22             THE COURT:  Well, this one is more than just showing

23   membership with the YPG.  It's, you know, with a group of other

24   people with weapons.  He's in it it looks like, is that right,

25   Mr. Kunz?  Is that him in it?  That's the defendant in the

1    picture?

2            MR. KUNZ:  Yes, sir.  He indicates -- he is actually

3    third from the right.

4            THE COURT:  Okay.  I see that he says that there.

5            MR. MURRELL:  If I could say this, it certainly makes

6    the YPG look like a band of terrorists.  You got a mask on, you

7    can't see the faces.  You got a rocket launcher.  I think if you

8    want to take a picture that looked like it's showing Middle East

9    terrorists I think you could take a better one.

10           MR. KUNZ:  Judge, he posted this again.  This links to

11   months later that it's a true threat that he's making.

12           THE COURT:  You were making a separate argument about

13   your YPG witness, right?  I mean, you're not arguing this is not

14   relevant?

15           MR. MURRELL:  Well, I think, again, you know, we

16   got -- I think it's a 403.  I mean, you know, we've got, I think

17   it's going to be up to 20 pictures of the YPG before we know it.

18           THE COURT:  All right.  Same ruling on that.  It is

19   relevant and I'm not going to exclude it under 403.

20           11?

21           MR. MURRELL:  11, same 403 objection.  It's more

22   evidence he was in the YPG.

23           MR. KUNZ:  Judge, if I might?  This is actually a

24   sniper rifle.  And he had discussion in some of his posts with

25   respect to sniper rifles, being a sniper.

```
1              THE COURT:  It's overruled as to 11.

2              MR. MURRELL:  12A I think is connected with, I assume

3    that's connected with the video.  I don't know.

4              MR. KUNZ:  12B, there is a screenshot on 12B that he

5    posted.  And this talks about that video that we're going to

6    introduce.

7              MR. MURRELL:  Again, it's just more YPG.  But I would

8    object on the basis of 403.

9              THE COURT:  To 12A and B?

10             MR. MURRELL:  Yes.  I think they are connected.

11             THE COURT:  That's overruled as well.  13?

12             MR. MURRELL:  13.

13             MR. KUNZ:  Judge, a third of the way down, if I may

14   interrupt on this.

15             THE COURT:  Yes, sir.

16             MR. KUNZ:  Indicates, this is war, are you willing to

17   take up arms with us yet, buy guns and join us this November,

18   we're voting from the rooftops.

19             THE COURT:  Right.  And that's just a couple of months

20   before the --

21             MR. MURRELL:  That was in October of 2020.  Here

22   again, the charge here is that he posted this threat to defend

23   the capitol and fight those who might overrun the capitol.

24   Well, I just don't frankly see the relevance in that.  I would

25   object on that basis.
```

1          THE COURT:  Okay.  Well, it is relevant.  Again,

2   getting to the context of what we talked about before and the

3   statements that he made, courts are clear that the statements

4   leading up to that provide context for whether he is serious

5   about these or not.  And these certainly are relevant to that

6   context and that intent.  So it's overruled as to relevance.

7   403, same ruling as before.

8          Go ahead.  That takes us to 14.

9          MR. MURRELL:  We are going to 14, same 403.  I mean,

10  again, --

11         THE COURT:  What is 14?  Is this an article?  What is

12  this?

13         MR. KUNZ:  Yes.  It's part of an article, Judge, that

14  he had posted where he was interviewed and talked about the CHOP

15  down in Washington.

16         THE COURT:  So he posted this article, the defendant

17  did?

18         MR. MURRELL:  He did, yes.  He did.

19         MR. KUNZ:  I'm not sure he posted it, Judge.  But he

20  was interviewed in this indicating he's a hardcore leftist -- he

21  indicated here that there was a lack of violent opposition there

22  at CHAZ and they need to get AK's and start making bombs and no

23  one -- he says listen to me, you should be listening to me.  But

24  that's what it's in reference to, Judge.

25         MR. MURRELL:  Well, this is -- I was wrong.  And

1    Mr. Baker did not post this.  I thought he did.  It's hearsay.

2    We don't have any indication of reliability.  We don't know who

3    wrote this or who he said this to or who made the claim.  So I

4    think that -- I think it's simply inadmissible hearsay.

5           THE COURT:  What's the answer to that, Mr. Kunz?

6           MR. MURRELL:  And, also, there is no authentication.

7           MR. KUNZ:  Judge, it's going to be his statements.

8    It's not hearsay.

9           THE COURT:  Well, I guess --

10           MR. KUNZ:  Authenticating it, that may be different.

11           THE COURT:  Well, that's a real issue, but I think if

12    it were -- it's someone saying that he said that and we don't

13    know who this someone is, so I think there would be a step

14    missing before we got to the point of saying it was his own

15    statement.  But what's the answer to that authenticity or

16    what --

17           MR. KUNZ:  Judge, if you hold your ruling on this in

18    abeyance and let us go through this.

19           THE COURT:  Okay.  We'll do that.  But if it's just

20    something some agent found on the Internet without knowing where

21    it came from that might be an issue.

22           MR. KUNZ:  No, I understand, sir.

23           THE COURT:  We'll reserve on 14.  15?

24           MR. KUNZ:  15, Judge, the first, about a third down he

25    indicates, I hope the right tries a coup on November 3rd from

```
 1   effing down the state to slay enemies again.

 2              THE COURT:  Right.  Okay.  And the objection to this

 3   one, if any, Mr. Murrell?

 4              MR. MURRELL:  I mean, relevance.

 5              THE COURT:  Okay.  That one is overruled.  17?  Let's

 6   start with, see there may not be any objections or maybe it will

 7   be the same one.

 8              MR. MURRELL:  17 I would object to that, yes.  My

 9   understanding is this is a picture showing Mr. Baker practicing

10   jujitsu with his roommates.

11              THE COURT:  Is this something that was posted on his

12   Facebook page, Mr. Kunz?

13              MR. KUNZ:  Yes, Judge.  It's in the -- from the search

14   warrant that we did, Judge, for his account.  That's how we

15   located it.  And there's actually the shotgun that was seized

16   and then the pistol is on the first shelf, the one that was

17   later seized.  This was done in November, Judge.  And two months

18   later when he issued the threat he still has these weapons.

19              THE COURT:  What was done in November?

20              MR. KUNZ:  This is a video from November, Judge, that

21   he put on YouTube.

22              THE COURT:  And this is a still from a video?

23              MR. KUNZ:  Yes, sir.

24              THE COURT:  Okay.  And you're going to put in the

25   still, not the video?  I mean, this is your exhibit?
```

1          MR. KUNZ:  The video, Judge, would be in the YouTube

2    search warrant and that's what we're going to present to the

3    jury.  We did a search warrant on YouTube and we found this

4    video with him in there with the shotgun.

5          THE COURT:  So my question is, 17 is a video, it's

6    not -- we're just looking at a still?  Or is the jury going to

7    see a still or video or a still if this is admitted?

8          MR. KUNZ:  I'm sorry.  I apologize.  Just a still,

9    Judge.

10         THE COURT:  All right.  And the objection is what, Mr.

11   Murrell?

12         MR. MURRELL:  Well, I guess, something was going up

13   because of jujitsu but I suppose they are showing it because of

14   the firearm.  Here again, a lot of evidence that he had a

15   firearm in a lot of photos so I would just suggest this is

16   cumulative and object to it on that basis.

17         THE COURT:  Okay.  That's overruled.  18 is a Facebook

18   business record.  Do you have an objection to that one, Mr.

19   Murrell?

20         MR. MURRELL:  404 and 403.  I mean, --

21         MR. KUNZ:  Judge, the relevancy would be this is from

22   his Facebook account and he posted this.  And he indicated,

23   giving some advice about the revolution that he learned from

24   CHAZ CHOP.  And if you look at number five, we have to learn to

25   operate without communicating sensitive details over smart

1    phones and radio.  We have to go low tech.  And, of course, the

2    defendant -- the evidence will be presented at trial that the

3    defendant had a special app put on his phone, a signal app that

4    is encrypted and prevents others from finding out who he's

5    communicating and what he's done.  And at some point he deleted

6    it and deleted everything on that, Judge, prior to the threats

7    that he issued.

8         MR. MURRELL:  Okay.  Again, maybe I should look at the

9    rule.

10         THE COURT:  I'm sorry, I didn't hear you, Mr. Murrell.

11         MR. MURRELL:  I guess I should make it a little

12    clearer.  I think we need a revolution great.  But, again, that

13    seems to me that's separate from whether or not he wants to

14    defend the capitol.

15         THE COURT:  Okay.  Well, I do find that this is the

16    type of context we were talking about before that the courts

17    have said are inextricably intertwined with the offenses here.

18    So I find it's relevant.  I find 404 is not applicable.  As an

19    alternative, I would find if 404 were applicable that these

20    statements would come in anyway because they go to his intent

21    and state of mind as to what he meant with these statements

22    there that are at issue in this case.  And then, so that will be

23    overruled as to 18.  Also, 403 objection is overruled for the

24    same reasons as with the others.  Yes, sir?

25         MR. MURRELL:  I was going to move on to 19.  I suppose

1   the relevancy is he got this artwork and he says, they are going

2   to be valuable when I'm in prison limited time only LMAO,

3   laughing my ass off.  If this is sort of a joke that the

4   government thinks is relevant I guess they can introduce it.

5   But I don't have any objection if they want to introduce it is

6   obviously a joke.

7           THE COURT:  Okay.  So there's no objection to 19.

8           MR. MURRELL:  20, here again, this is a business they

9   got some NAZI's are going to be real sad when this happens to

10  their headquarters.  I just don't see what this has to do with

11  our case.  I would object to the relevancy and substantially

12  outweighed by the unfair prejudice.

13          THE COURT:  What is this image here in number 20, Mr.

14  Kunz?

15          MR. MURRELL:  My understanding is these are

16  hand-grenades or bombs or something being dropped.

17          THE COURT:  Being dropped, okay.

18          MR. KUNZ:  Bombs being dropped.  Yes, sir.

19          THE COURT:  That's what I thought.  And then the

20  statement is?

21          MR. KUNZ:  On the next page.  And it shows he's

22  willing to discuss at this point acts of violence and threats,

23  Judge.  And it's just consistent with someone who, when the

24  threats were made, they weren't something in isolation.  These

25  are talked about.  This is able to do it, capable to do it and

1    discussing how to do things like that.

2         THE COURT:  Okay.  This will be overruled as well.

3    20.  So that's 21 is talking about buying more guns or buying

4    guns?

5         MR. MURRELL:  It's 21, we got a picture of Nancy

6    Pelosi giving somebody --

7         MR. KUNZ:  The rest of the post is on page 2.

8         MR. MURRELL:  I understand.  I don't know why we have

9    to have page one.  I don't know that Nancy Pelosi is a

10   controversial figure and we want to get that before the jury.

11   But as far as this next page, frankly, it's a joke, but I don't

12   think it's relevant to anything.  Again, this is just -- I don't

13   know I would call it propensity evidence.  You know, whether it

14   shows he is a warrior and he has this warrior-like character, I

15   just don't think that tells you anything about whether he meant

16   something by this threat when he talked about defending the

17   capitol.  So, again, I object to the 404 and 403 as well.

18        THE COURT:  Well, I do disagree with you on the

19   relevance.  If someone is presenting himself or herself as a

20   warrior in these types of posts I think is a factor that the

21   jury would be able to consider in determining whether there was

22   a subjective intent behind the statements or not.  What's the

23   response though, Mr. Kunz, as to this picture?  I guess it's a

24   photo-shopped picture from a television show; is that right?

25   It's got Speaker Pelosi's face.

```
1              MR. KUNZ:  This post is about stimulus checks of $600
2    and his response, as he sent out is, well, if you give 2,000 we
3    are just going to buy more guns, 600 or 2000.
4              THE COURT:  And then the stuff below that is what?
5    That's just what came along with it?
6              MR. KUNZ:  Yes, sir.
7              THE COURT:  I am going to reserve on that.  21, we'll
8    come back to that one.  22?
9              MR. MURRELL:  I think that it shows bad character
10   which could be an explanation for this, but if you are willing
11   to assault a cop, protest, stop counting at 16 kills, it talks
12   about leftist sniper and the YPG in the national battalion, I
13   don't know, I suppose these are all different anyways, but the
14   first one I would suggest he had bad character, but nothing
15   about assaulting police officers in this thread.  I don't see
16   what that has anything to do.  Stop counting at 16 kills and the
17   leftist sniper and the YPG, again, we're talking about the YPG.
18             THE COURT:  Which page are you on, Mr. Murrell?  I'm
19   on a different page.
20             MR. MURRELL:  Top of 1933, and --
21             MR. KUNZ:  Exhibit 22, sir.
22             MR. MURRELL:  Exhibit 22.
23             MR. KUNZ:  About halfway down, Judge.
24             THE COURT:  All right.  I see the highlighted one
25   here.
```

1           MR. KUNZ:  That's it.

2           THE COURT:  Okay.  I thought you said something about

3    the YPG.

4           MR. MURRELL:  Well, the YPG is on the next page.

5           MR. KUNZ:  That's a different exhibit.

6           MR. MURRELL:  That's a different exhibit?

7           MR. KUNZ:  Yes, sir.

8           MR. MURRELL:  Oh, okay.  So 22 is just one page?

9           MR. KUNZ:  Yes, sir.

10          MR. MURRELL:  Okay.  Well, again, I would object to

11   that.  I just don't -- it shows to me bad character.

12   Irrelevant.  Doesn't say anything about whether he thinks he

13   needs to defend the capitol.

14          THE COURT:  What is the -- this is a, it says

15   Instagram business record, but this is messages going back and

16   forth through the platform?  Is that what's going on?

17          MR. KUNZ:  Yes, sir.

18          THE COURT:  And so you have one highlighted here but

19   there's others that have the same user thing.  So it's a

20   conversation between the defendant and someone else?

21          MR. KUNZ:  Him and somebody else.  Yes, sir.  And that

22   Clapirin, that's him, Judge.  We have information to that.

23          THE COURT:  Right.

24          MR. KUNZ:  So this is relevant, Judge, because in two

25   weeks he puts out a threat about how he is going to circle the

1  capitol.  And obviously law enforcement is going to be there.

2  And this, again, goes to show his intent for violence, are you

3  willing to assault a cop at a protest.  That's what his threats

4  are all about.  These guys come protest we're going to move in

5  there and force them into the capitol.  And obviously the police

6  are going to be in the middle of that, Judge.

7           THE COURT:  This highlighting is your highlighting, I

8  take it?

9           MR. KUNZ:  Yes, sir.

10          THE COURT:  Okay.  And then if you go three or four

11  above that, the highlighted portion, what's this statement here?

12  What's going on with that or do you know how to interpret that?

13          MR. KUNZ:  He's indicating, Judge, that he has killed

14  Americans who were engaged as ISIS, Judge.  That's what that is,

15  ISIS.

16          THE COURT:  That's not a term I was familiar with.

17  All right.  Well, it is I think relevant, the same way these

18  others were in terms of the context in determining subjective

19  intent.  So that one's overruled.  403 is overruled as well.

20          23?

21          MR. MURRELL:  Same as all of these other ones.  403

22  and 404.

23          THE COURT:  Did you have a 404 objection on 22 or was

24  that just --

25          MR. MURRELL:  22 was 404 as well as 403.

1          THE COURT:  Okay.  Well, the ruling on 22 and 23 as to

2    the 404 is that it's not a 404 issue because it's inextricably

3    intertwined with this case, but alternatively it would be

4    admitted under 404 as intent and state of mind evidence.  So

5    that takes us to 24.

6          MR. MURRELL:  No objection to 24.

7          THE COURT:  Okay.

8          MR. MURRELL:  There's no objection to that.  I think

9    they are going to make an issue of the fact that he bought a 22

10   riffle so I suppose it's relevant to that.

11         Exhibit 25, this is a death to America, of course,

12   about the president current elect.  Just other than to show that

13   he says some things that aren't very prudent and maybe bad

14   character.  I just don't see the relevance to that.  I mean, the

15   whole idea of the call to arms was he was going to defend the

16   capitol.

17         THE COURT:  Right.  There are messages on here too

18   talking about a violent militant coup, if you don't have guns

19   you won't survive 2021, further racists planning to attack

20   Tallahassee.  Those were above and below the ones you mentioned.

21         MR. MURRELL:  Oh, I see.  Right.  Well, it's great

22   that the president plans a violent militant coup, but I just

23   don't see the relevancy.

24         THE COURT:  Okay.  That one I do find as relevant for

25   the same reasons as the others.

```
 1              26?

 2              MR. MURRELL:  26.

 3              MR. KUNZ:  Judge, our copy of this exhibit is hard to

 4    see, but it's actually --

 5              THE COURT:  It looks like Homer Simpson.

 6              MR. KUNZ:  And he has a firearm with him while the

 7    place is burning around him.

 8              MR. MURRELL:  Well, again, it's hard for me to see the

 9    relevancy.  404, 403.

10              MR. KUNZ:  And the date is January 20th, Judge.

11    That's consistent with the threat.

12              THE COURT:  Right.  And the text it says here, you

13    know who you are.  Who wrote that text?  Is that attributed to

14    him on this record?

15              MR. KUNZ:  Yes, sir.

16              THE COURT:  I think that's part of the context.

17    Relevance objection is overruled as to that one.

18              MR. MURRELL:  No objection to 27 or 28.  I don't know

19    what happened to 29.

20              MR. KUNZ:  It's a video, YouTube video of the

21    defendant printing these, the fliers.  They are the call to arms

22    fliers, Judge.  Some of them were seized at his premises.  And

23    that's what was being posted, that he posted that call to arms

24    flier.  He is printing it in the YouTube.  He took a YouTube

25    video of himself printing these things, Judge.
```

```
1                    THE COURT:  Oh, okay.
2                    MR. MURRELL:  That's fine.  I don't have any objection
3       to that.
4                    I don't have any objection to 30.
5                    THE COURT:  Okay.
6                    MR. MURRELL:  No objection to 31.  And is that it, 31
7       is the last one?
8                    THE COURT:  Is 31 all of these, okay.
9                    MR. MURRELL:  31 is a whole series of photos that I
10      see.  Okay.
11                   THE COURT:  It's not the last one, by the way.  I
12      think there is 34 after that.  31 are all search warrant photos;
13      is that right?
14                   MR. KUNZ:  Yes, sir.
15                   THE COURT:  Any objection to 31, Mr. Murrell?
16                   MR. MURRELL:  Let me see here.  Yeah, there is one
17      with the YPG badge.  I think we are putting a lot of -- this is
18      maybe the best example yet how important the government wants
19      the jury to think the YPG is.  We managed to zero in on the
20      patch and they want to introduce that into evidence.
21                   THE COURT:  So that's just a 403 objection, is that
22      what that is?
23                   MR. MURRELL:  Yes, sir.
24                   THE COURT:  Okay.  That one is overruled.
25                   MR. MURRELL:  There's also a photo here of two books.
```

1    This next page is a shot of the Quran and a book of

2    Revolutionary Suicide, a book by Huey Newton.  I think the Quran

3    is particularly suspect.

4             THE COURT:  Where is the Quran in this photo?

5             MR. MURRELL:  If you look at the -- you're looking at

6    the --

7             THE COURT:  Oh, I see it.  I'm sorry.  Yes, sir.  I

8    see it.

9             MR. MURRELL:  And so I would object.  I think that it

10   is irrelevant and unfairly prejudicial.  I would object to that

11   one.

12            THE COURT:  Do you object to, okay.  So as to, let's

13   see now.  Within 35 your objection to the YPG photo and I've

14   ruled on that one and then also to the bookcase photo?

15            MR. MURRELL:  The bookcase that shows the Quran and

16   the book Revolutionary Suicide.

17            THE COURT:  Yes, sir.  I'm going to -- I can't tell

18   what else is in this collection here.

19            MR. KUNZ:  Judge, to the left of the bookcase is call

20   to arms that he sent actual threat.  He has it posted on the

21   wall there.

22            THE COURT:  Okay.  So that's what you're after, not

23   the books, not the Newton book or anything else?

24            MR. KUNZ:  Again, Judge, he has got a book called

25   Revolutionary Suicide, just another indication his threat was it

```
 1    just make belief or a true threat.  This whole thing of him
 2    being a warrior, being a legitimate warrior and wanting to do
 3    this.
 4            THE COURT:  Well, there's no question that you're
 5    right about that as to the call to arms photo that is printed
 6    and has hanging on his wall.  I think it goes to sort of his
 7    seriousness about this.  I don't know what that thing is below
 8    it, but I know it was part of the -- in one of the other
 9    exhibits.  And it looks like it's also in the middle of the
10    bookcase there.
11            But what do you say about the Quran being featured
12    prominently there?  I mean, you could redact the right-hand
13    third of that photo without missing anything that you're talking
14    about I suspect.  I'm not saying you have to but -- I can't tell
15    what else these other books are, but I would be concerned with
16    knowing what else is on this bookcase before ruling on that.  So
17    I'm going to reserve on this one except that, to the extent that
18    the request is to exclude the whole thing that would be
19    overruled because I think Mr. Kunz is right about the call to
20    arms hanging on the wall at the apartment and probably the
21    Newton book as well.  But the actual exhibit that you would
22    present to the jury would be clearer than this, Mr. Kunz?
23            MR. KUNZ:  A little bit, Judge.  But this is not too
24    bad a representation of the actual photo we would show.  It may
25    be a little clearer when we put it up on the screen.
```

1          THE COURT:  All right.  Well, I'm going to reserve on

2    that one at least as to the right-hand side of the picture.

3    It's a part of --

4          MR. KUNZ:  31, sir.

5          THE COURT:  31.  So 31 has, Exhibit 31 has eight

6    photographs.  There is no objection to any of them except for

7    the fifth, which is a closeup of a couple of books and a patch,

8    a YPG patch.  I've overruled that objection.

9          The sixth photo is of a bookcase.  And that's the one

10   I'm reserving on.  And then the seventh is of a smart phone.

11   And I assume there's no objection to that, Mr. Murrell?

12         MR. MURRELL:  No, I don't have any objection to the

13   rest of the --

14         THE COURT:  So then that takes us to 34.

15         MR. MURRELL:  Yeah.

16         MR. KUNZ:  Those relate to the purchase of the --

17         MR. MURRELL:  I don't have any objection to the rest

18   of the exhibits.

19         THE COURT:  Okay.  And 34, these are produced by

20   Google, these are Gmail messages just in the form that they are

21   produced?

22         MR. KUNZ:  From Cellebrite from his phone, Judge.

23         THE COURT:  Okay.  From cell phone extractions, okay.

24         MR. KUNZ:  Yes, sir.

25         THE COURT:  And that's all of 34.  And you do not

 1    object to 34, Mr. Murrell?  And you don't object to 34 or 35?

 2              MR. MURRELL:  No.  It should be clear that the photos

 3    of the rifle, the records of the -- the photos of the rifle and

 4    so on were taken at the pawnshop where they retrieved the gun.

 5    They were not part of what was on his cell phone, as I

 6    understand it.  I think there was one -- there is some

 7    information on the cell phone about the gun, but most of the

 8    photos were taken there at the pawnshop.

 9              MR. KUNZ:  That will be explained.

10              THE COURT:  Okay.  So a witness will say where these

11    photos came from?

12              MR. KUNZ:  Yes, sir.

13              THE COURT:  All right.  That addresses the photos

14    except that we'll revisit those that I mentioned.  Does anyone

15    need a break?  How's everyone doing?  Okay.  We're going to

16    take -- let's snap out what else I wanted to cover and then

17    we'll take a quick break.  I want to talk a little bit about the

18    jury instructions.  I don't think we'll resolve everything

19    today, but I think we can figure out what is maybe common ground

20    and then some of it is obviously going to depend on what's

21    presented at trial.  But I want to get a little bit better

22    understanding of the basis for one of our proposals, Mr.

23    Murrell.  And then we can talk about the jury voir dire topics.

24    I saw what you filed.  I also saw that the government filed

25    something very recently.  I don't know if you've had a chance to

1    look at those or not, Mr. Murrell.  But if you did we can

2    talk --

3              MR. MURRELL:  They filed something about voir dire?

4              THE COURT:  Yes, sir.

5              MR. MURRELL:  I haven't seen that.

6              THE COURT:  Okay.  Then we may just talk about those.

7    Then next we can talk about yours at least if both sides are

8    prepared on that.  Anything else that we should cover today?

9              MR. MURRELL:  No.  I think we can come back and do

10   some of those things I think we'll be --

11             MR. KUNZ:  Judge, the only issue was, counsel let us

12   know that he intended to put in a portion of a recording of the

13   defendant with the law enforcement.  And it's an out of court

14   statement, Judge.  And we are not having any testimony with

15   respect to the statements made by Mr. Baker at this time when it

16   was recorded.  We are having a witness testify with respect to

17   some earlier statements while transporting him.  But when he

18   actually was being interviewed, and it was a very short period

19   of time, he made a statement that counsel wants to put in.  Our

20   position is, Judge, the defendant can't offer his own out of

21   Court statement during testimony before a jury without being

22   subject to cross examination.  And United States versus Willis

23   in the Eleventh Circuit is clear on that, Judge.  759 F2d 1484.

24   I'm just raising it now, Judge.  If you want us to file a formal

25   motion in limine we can do that, but that's the one defense

1    exhibit that we do object to.

2            THE COURT:  That's 759 F2d.  What was the page number?

3            MR. KUNZ:  1486.

4            THE COURT:  1486.  Okay.  I'll take a look at --

5            MR. KUNZ:  It's at page 1501.  It's an Eleventh

6    Circuit 1985 case.

7            MR. MURRELL:  If it helps the Court, it's not hearsay.

8    I'm not using it to prove the truth of the matter asserted.

9            THE COURT:  Okay.  Well, we'll address that when we

10   come back.  And we may or may not have briefing on it, but we'll

11   cover a few more things after about a 15-minute break.  And

12   we'll be in recess.

13       (Recess taken 3:37.)

14       (Resumed at 3:56.)

15           THE COURT:  Please have a seat.

16           Okay.  It looks like everyone is back.  So we've

17   reserved a lot of the issues on the government's exhibits.  I

18   guess we'll talk about the defense exhibits next.  I just want

19   to sort of expand on the ruling on the 403 issue as to the YPG.

20   And there's a lot of arguments about how many patches do we need

21   and things like that.  Again, the weapons training that he

22   received in the YPG is relevant.  The willingness to travel

23   abroad and fight for what he believes in, risk death, all that

24   thing I think is relevant to the subjective intent here.

25           You know, the argument is well, do we need 10 patches

 1    instead of nine.  One, I don't think there's prejudice from

 2    that, certainly not unfair prejudice.  But, two, I think each of

 3    those pictures, each reference to that makes it more likely that

 4    he did, in fact, participate in that and also, you know, that it

 5    meant a lot to him and, again, what his subjective state of mind

 6    was.  It's the government's burden here.  The 403 exclusion

 7    requires a high showing and I don't think you've met it.  So

 8    that's just a little more explanation.  I didn't want to make it

 9    seem like we were going through those too quickly.  But that's

10    the ruling as to the YPG stuff.

11            Are there objections to the defense exhibits?  Are you

12    prepared to talk about that, Mr. Kunz?  Other than the one that

13    you just mentioned, are there -- let me pull up that list.

14            MR. KUNZ:  That would be number 1, Judge, from his

15    exhibit list that I just referenced.

16            THE COURT:  Let's talk about -- are there other

17    objections?  He's only got three other things here; the news

18    articles, and the post about George Soros.

19            MR. KUNZ:  Number two, Judge, we would object to.

20            THE COURT:  You do or do not?

21            MR. KUNZ:  We do, sir.  It's a hearsay newspaper

22    article offered to prove the truth of the matter, Judge.  And I

23    don't know how that would be authenticated.  But we do object to

24    number 2.

25            MR. MURRELL:  It's not used to prove the truth of the

1    matter asserted.  The issue is what would the general public

2    know.  And the fact there is something in the newspaper article

3    that says, we don't know any specific threats, tells us what

4    information was available to the public.  So it's not to be

5    used --

6          THE COURT:  Well, that does relate to sort of what we

7    talked about before about the subpoenas.  And I did go back and

8    look at that article on this break here.  And the article is

9    quoting officials saying the things that I assume you wanted

10   them to say when you subpoenaed them.  There it would be for the

11   truth of the matter.  So I think to the extent we still have the

12   subpoena issue outstanding, I just want to be clear to you that

13   if any of it would be permitted it would be did you say this.

14   Not, is this true.  Not, did you really -- the statements in

15   there are we're not aware of any specific threats and things

16   like that.  And that's what I've ruled you wouldn't be able to

17   get into, whether they assessed that or not.

18         If the question is well, what did the public know,

19   what would a reasonable person have -- what's the context of

20   which a reasonable person would have viewed all this, unless the

21   question to those witnesses are did you, did you put out any

22   other public statements beyond what's captured here.  Because

23   really whether they even said those things wouldn't be relevant

24   to the point that you're trying to make.  It was in the

25   newspaper.  Whether he said or not, even if someone comes in and

1    says, oh, I was misquoted, I never said that.  If your point is,

2    well, what the public was told is what's relevant.

3            MR. MURRELL:  I don't know whether there were other

4    public announcements.  And I understand the ruling.  I think the

5    Court understands I think it should be admissible for the truth

6    of the matter asserted.

7            THE COURT:  No, I understand.

8            MR. MURRELL:  But you ruled against me on that so I

9    would only introduce the testimony, ask the question well, what

10   information did you disseminate about known threats to the

11   capitol.

12           THE COURT:  Okay.  Well, getting back to the specific

13   objection on number two, you have an authenticity objection

14   which would have to be resolved somehow.  But in terms of the

15   hearsay, what's the response to the argument that it's really

16   not for the truth it's just, you know, what --

17           MR. KUNZ:  Judge, excuse me.  There's no reason to put

18   it in except for the truth of it.  He's trying to prove that

19   there was nothing out there that it was a legitimate threat.

20   And he's bringing a witness in to say or a newspaper article to

21   say that at time we don't know of anything.  Well, if we don't

22   know of anything why is that not being offered for the truth of

23   the matter asserted?  Clearly it is.  That's what he wants to

24   prove.  Because he's the one who says my defense is that was all

25   garbage, it wasn't anything going to be happening here and what

1    have you.  And from the government's perspective, Your Honor, it

2    is clearly being offered for the truth of the matter asserted.

3    Not just that it was said because it's not relevant to anybody's

4    action that it was said that they did or didn't do something.

5            THE COURT:  But isn't it relevant to -- isn't what was

6    presented to the public at that time going to help control how a

7    reasonable person receives something?  In other words, if you

8    make that exact same statement three-years ago isn't it going to

9    be received totally differently than it would have been on the

10   day it was submitted in the context of what happened in

11   Washington and what was being speculated might happen in state

12   capitols?

13           I mean, it seems like if the government is going to be

14   able to say, well, there was this sort of nationwide discussion

15   about whether this was going to happen in all of these state

16   capitols and law enforcement was tuned in to the fact that there

17   was chatter about risks like this, that they ought to be able to

18   say, well, there was chatter that it was not a serious thing,

19   but whether it was actually true or not.

20           MR. KUNZ:  See that's not correct, Judge.  It's not

21   chatter that it wasn't a serious thing.  You know, they had --

22   Leon County Sheriff's Office had their command center all put

23   up.  They were all getting ready.  The possibility of whether it

24   happens or not is a different issue.

25           THE COURT:  I agree with that a hundred percent,

1    whether it happens or not is not relevant.

2         MR. KUNZ:  I mean, I don't think a jury should be

3    asked to say, well, let the defense argue well, it's

4    unreasonable for you to believe that this was really a threat

5    because they said at that point there wasn't anything specific.

6         Our position, Judge, it's not relevant.  That's not

7    relevant to the determination by the jury of, A, his intent or,

8    B, with respect to the threat that's made how, would that be

9    interpreted objectively by a reasonable person using common

10   sense.  If there was -- frankly, Judge, I know it's three-years

11   ago and there wasn't this discussion here, I'm not sure we'd

12   even be talking about that.  I don't think it would be an issue

13   before a jury.

14        THE COURT:  I'm not following your last argument.

15        MR. KUNZ:  Sir?

16        THE COURT:  I didn't follow what you just said.  It's

17   probably my fault.

18        MR. KUNZ:  May I take my mask off?

19        THE COURT:  Certainly.

20        MR. KUNZ:  My point, Your Honor, is that as you

21   indicated, it's a different climate.  It was three-years ago.

22   And three-years ago this would not be a defense, an argument for

23   a defense that, oh, there was nothing going on because we had

24   nothing to compare it to.  So the jury would be looking at this

25   threat in the context of if it's a threat or not regardless of

1    the factor of whether there really is, based on what happened at

2    the capitol on January 6th, is there going to be some protest at

3    the state capitol or not.

4            And add to the fact, Judge, that the defendant himself

5    had that post.  He had that posted.  And one of the exhibits we

6    are going to put in, it says all the state capitols, you know,

7    we're going to do armed protests and stuff.  And so is he acting

8    on that improperly?  I mean, the defense is going to argue that,

9    but I don't think that's a defense to why you put this threat

10   out, was it a true threat.

11           THE COURT:  Okay.  I'm going to reserve on that one.

12   You mentioned the video.  Do you have objections to the last two

13   exhibits?  I guess there are two newspaper articles.  You'd have

14   the same position on both of those, right?

15           MR. KUNZ:  Are you talking about number 3?

16           THE COURT:  Number 3 is the CNN article.

17           MR. KUNZ:  Judge, the reason we told counsel we're not

18   going to object to that is that there was a link put by the

19   defendant on the call to arms where he put this link to this CNN

20   article.

21           THE COURT:  All right.  So you're not objecting to

22   number 3?

23           MR. KUNZ:  We think it's part of it.

24           THE COURT:  Okay.  And number 4?

25           MR. KUNZ:  Judge, we're not going to object to that.

1    There is a comment on a YouTube video that will be in evidence

2    already.  Counsel could argue that.

3            THE COURT:  Okay.  All right.  So that leaves number 2

4    I've reserved on.  Number 1 is this video that you alluded to a

5    hearsay objection.  And it looks like it's about a minute worth

6    of questioning.

7            What's the substance of that, Mr. Murrell?

8            MR. MURRELL:  Mr. Baker says a number of things.  He

9    says that he believes that the FBI has been infiltrated by white

10   nationalists.  He says that he believes -- oh, he believes that

11   Chic-fil-A is supporting groups in Africa that are opposed to

12   gay rights.  And he says that he lives in fear when he's out

13   panhandling that some NAZI is going to come by and blow his head

14   off.  They are not being used to prove the truth of those

15   claims.  It's simply to try to explain Mr. Baker's world view of

16   things.  And at least as I see it, that some of his views are

17   not entirely accurate.

18           THE COURT:  Okay.  And so, you have a hearsay

19   objection and what else?

20           MR. KUNZ:  Judge, it would be hearsay based on Circuit

21   precedent, but also in the Willis Court, the Eleventh Circuit in

22   the Willis case, Judge, they really answered this exact

23   argument.  And they said at page 1501, arguments that statements

24   such as these are offered to prove quote state of mind unquote,

25   rather than the truth, are misleading.  And the Court said, this

1    is precisely the issue on which the statements clearly would be

2    offered for their truth and therefore the issue on which remarks

3    are unquestionably hearsay.

4            And if he wants to say this, Judge, he can take the

5    stand and say it so we can cross examine him rather than him

6    putting in a self-serving statement.  And that's the whole

7    purpose of U.S. versus Willis.

8            MR. MURRELL:  I mean, if Mr. Kunz thinks I'm putting

9    these statements in to prove that the FBI was infiltrated by

10   white nationalists, that Chic-fil-A is financing anti-gay

11   efforts in Africa, and that somebody was going to blow off --

12   Nazis were going to blow off Mr. Baker's head he is badly

13   mistaken.  I don't think -- that's clearly not the reason I

14   would introduce something like that.  And, the relevancy, again,

15   is to give the jury some feel for Mr. Baker's world view and to

16   show that some of his beliefs, some of his claims are not

17   entirely accurate.

18           THE COURT:  I think I understand both arguments.  I'm

19   going to reserve on that too.  And I may want to look at the

20   video.  I take you at your word what it says, but I want to give

21   that a little more consideration.  If either side wants to brief

22   it they can, but I'm not requiring you to.

23           MR. MURRELL:  I don't have it with me, but I do have a

24   transcript of that very testimony if that would aid the Court.

25           THE COURT:  That would.  But I'm not going to address

1    it right now.  But that that would be helpful.  That's it on the

2    defense exhibits.  In short there's two there that are not

3    objected to and there's two that we'll address later.

4            Did you get a chance to look at the voir dire topics,

5    Mr. Murrell?

6            MR. MURRELL:  Yes.  The Court was good enough to give

7    me a copy.  And for that matter, Mr. Fields offered to give me a

8    copy too.  And I have it on my phone.  So yes, sir, I see it.

9            THE COURT:  Are you prepared to talk about it now or

10   let me know if there's any issues?  And we can revisit later

11   Monday morning or Tuesday morning, but it would be helpful just

12   to know what each side thinks of what the other side's submitted

13   so I can prepare.

14           MR. MURRELL:  I'm happy to talk about it if the Court

15   wants to hear about it.

16           THE COURT:  Yes, sir.

17           MR. MURRELL:  Well, the first one sure ask about

18   publicity.  That's fine.  Two or three that I have the greatest

19   concern about.  I think I presented these same issues in a, I

20   would say a more delicate fashion, trying to avoid being too

21   precise about what the facts do or do not show.  But I think

22   that's the shortcoming of the government's questions in number

23   two.  And it involves an allegation that threat was made by

24   defendant to use firearms to kill and kidnap other individuals.

25           Well, I think that mischaracterizes what the threat

1  was.  And that's the trouble when we have the Court asking these

2  questions.  You know, it conveys to the jury that this is

3  what -- this is how the Court sees the evidence.  And we

4  certainly disagree that that's an accurate characterization of

5  the evidence.  And, again, I tried to present this issue to the

6  jury but in a more benign way.

7          Three is the same --

8          THE COURT:  As to that, obviously, the jury needs to

9  be asked or the prospective jurors need to be asked if they are

10 going to be able to handle the types of allegations that are

11 going to be made.  And the political views I think is a fair

12 question about that too.  Why don't you all get together and see

13 if you can find common ground.  I think there's a lot of

14 agreement in there.  And I think conceptually, I don't have an

15 issue with anything that's been proposed at sort of a high

16 level.  I think you're right, there may be some avenues for fine

17 tuning.

18         MR. MURRELL:  I don't think we're that far apart.

19         THE COURT:  Okay.  So three would be in the same

20 category?

21         MR. MURRELL:  Yes, Your Honor.

22         THE COURT:  Anything else, Mr. Murrell?  Are you going

23 through them?

24         MR. MURRELL:  No, there is really just two and three.

25         THE COURT:  Okay.

1          MR. MURRELL:  That I am concerned about.

2          THE COURT:  Okay.  Very good.  And then, Mr. Kunz or

3   Mr. Fields, have you seen what Mr. Murrell submitted, and do you

4   have any issues with it?

5          MR. FIELDS:  No, Your Honor.  I think like the Court

6   stated, we are pretty much in agreement with the issues we want

7   to ferret out.  That's all.

8          THE COURT:  Okay.  Well, why don't you all do that.

9   We can revisit it first thing Tuesday morning.  We can also make

10  some time Monday afternoon if you think that would be better.

11         On the jury instructions, you proposed two, Mr.

12  Murrell.  The second one I think is likely fine.  I'll certainly

13  hear what the government has to say.  But I guess they go

14  together.  I guess the reason you are proposing the second one

15  is to support the first one; is that right?

16         MR. MURRELL:  Yes, sir.  I suppose I still want the

17  one about, qualified threat of communication must be a threat to

18  commit an unlawful act regardless of what you decide on the

19  second.  But I think the jury needs to know what an unlawful act

20  is if this instruction is to have much meaning.

21         THE COURT:  What is, in terms of you're talking about,

22  there is sort of two components to that, defending the state and

23  then defending other people.  Tell me what the defense of the

24  state, the law that you believe is?

25         MR. MURRELL:  Well, my instruction is that citizens do

1    have a right to use arms to defend the state or in this case it

2    might be a harder call if you were talking about the typical

3    building a state building, but this is the capitol.  And I think

4    it's safe to say in defending the capitol you are defending the

5    state.  And I think the law is that citizens do have a right to

6    defend the capitol and use arms to do it.

7            THE COURT:  But not other state buildings?  I guess

8    that's why I'm struggling to understand sort of the baseline

9    legal principle that you're getting at here.

10           MR. MURRELL:  Again, maybe, you know, I go back to

11   John Brown.  And, well, anyways, what I'm saying is, if it's

12   some sort of insignificant state building do you have a right to

13   defend that?  I think that's a harder call.  I can see that.

14   But to me the capitol is a symbol of the state.  And if you're

15   defending the capitol you are defending the state.  So I think

16   that's accurate.  I don't think there is any -- I don't see how

17   the Court or government can disagree with that.

18           THE COURT:  That you have the right to defend sort of

19   the symbol of what the state is or stands for?

20           MR. MURRELL:  Yeah.  And I think when you're defending

21   the capitol you are, in fact, defending the state.  I mean,

22   historically you lose the capitol, you lose the state, you lose

23   the war.  So the capitol building is of real importance and it

24   represents the state.

25           THE COURT:  Okay.  Do you have any other, I mean, I

1  read the authorities that you cited here.  Do you have anything

2  else that would support that?

3       MR. MURRELL:  No, that's all I have.  You know, there

4  are questions about if the interaction is reasonable or

5  proportional and so on.  And, sure, that's an issue.  But I

6  think it's important for the jury to know that citizens do have

7  the right to defend, in this case, the capitol.

8       THE COURT:  We're probably not going to decide that

9  issue today, but I do want to hear sort of the government's view

10  on the first instruction and the second one.

11       MR. FIELDS:  Well, as to the second one, Your Honor,

12  the one just about, you know, that qualifies the true threat it

13  must be committed by an unlawful act.  I think there is more to

14  it that should be added, but that is legally I think correct

15  with some added language.

16       THE COURT:  Okay.

17       MR. FIELDS:  As to Mr. Murrell's argument regarding

18  defending the capitol, respectfully I just don't know that law

19  says that you have the ability to defend the state capitol

20  bearing arms.  And I don't know that this is a self-defense

21  case.  So I just don't know that the authority he cited or the

22  requested instruction would be relevant or appropriate to

23  instruct the jury.

24       THE COURT:  All right.  Well, we'll address that

25  later.  I do think on the second one, it's a correct statement

```
 1    of the law and the government proposed something similar.  They
 2    proposed some additional detail on that that you've objected to
 3    at least in part.  And I think both sides have fair points
 4    there.  I think that your overall point, Mr. Murrell, is that
 5    some of those points that the government is making are just
 6    things that the jury can balance.  And I'm not sure you would
 7    disagree with that.  But I think there is probably a potential
 8    for common ground there too.  So some time between now and trial
 9    I think it would be great if you all could talk and see if
10    there's something that would capture what both of you are
11    getting at.  And I think both of you, there's some, you have
12    some legally correct points in what you're doing there.  So I
13    think that's probably as far as we can go with jury instructions
14    right now.
15              What else for today?  Anything, Mr. Fields?
16              MR. FIELDS:  Your Honor, may I just inquire on two
17    issues as it relates to the experts just to make sure that this
18    runs efficiently?  I want to proffer to the Court, the way that
19    we would anticipate handling the YPG thing is just Mr. Baker
20    left the United States, joined the YPG.  What is it?  It's a
21    foreign militia and they fight in Syria.  And really that's it.
22              Now, but the reason why I want to bring this up is
23    because I don't want it to be suggested that we opened the door.
24    Because I expect that Mr. Murrell will say well, they are
25    fighting ISIS, which the government thinks is not a fully
```

1    correct statement.  They are also, in our opinion, an ally of

2    the United States.  And so if that comes out on redirect I just

3    want to be sure that we're not going to be flaunting the Court's

4    order and opening the door to potential expert testimony if that

5    eventually comes out.

6            THE COURT:  You are talking about if on cross

7    examination he says that they are fighting ISIS?

8            MR. FIELDS:  Just fighting ISIS, right.

9            MR. MURRELL:  I guess my question is, how is the

10   government going to get that in?

11           THE COURT:  That they are fighting ISIS?

12           MR. MURRELL:  Yes.  How are they even going to get

13   that in?

14           THE COURT:  They are not trying to is what I

15   understand Mr. Fields to say.  He's saying that you --

16           MR. MURRELL:  He's saying -- he's going to say it's a

17   militia fighting in Syria.  How do they even get that in?

18           THE COURT:  Fighting in Syria I think is what he said.

19           MR. MURRELL:  Fighting in Syria, it's a militia

20   fighting in Syria.  How do they get that in?

21           MR. FIELDS:  Through the agent, Your Honor.

22           MR. MURRELL:  Do you have a police officer testifying

23   to that?

24           MR. FIELDS:  We're going to have an agent.

25           THE COURT:  What's his basis of knowledge?

1          MR. FIELDS:  The agent spent time in the Middle East

2     and actually interviewed the defendant in Iraq.

3          MR. MURRELL:  And that makes him expert?

4          THE COURT:  Well, again, this gets back to what I was

5     saying before.  You don't have to be an expert to say that YPG

6     is militia that fights in Syria if you've seen that and know

7     that to be the case.

8          MR. MURRELL:  It's hard to prepare for them to get to

9     introduce their short version of it and then we can't explain

10    it.

11         THE COURT:  Well, the question is, do you get to

12    explain it?  That's what we're here talking about.

13         MR. MURRELL:  Here's the other twist, and I thought

14    about it afterward.  If Mr. Baker testifies certainly he's going

15    to talk about fighting for the YPG and what the YPG is.  So, I

16    mean, where does that leave us?

17         THE COURT:  Well, where that leaves us, let's go back

18    to the beginning, so if the statement is if someone is qualified

19    to say this is a militia that exists in Syria that he was part

20    of, and that if you cross examine and say well, isn't it true

21    that they were fighting ISIS and that they are good people,

22    wouldn't that make it, in fairness the government would be able

23    to say --

24         MR. MURRELL:  Again, I'm not even going to risk that

25    because we get into this stuff, oh no, they were fighting

1    Turkey.  I don't think he's qualified to say so I'm not even

2    going to ask that question.

3            THE COURT:  Okay.  And that gets back to where we

4    started off at the last hearing, which is the government is not

5    going to put in anything about the nature of YPG or what its

6    mission is or who its allied with.  And that being the case I

7    think would make it not appropriate to put on somebody whose

8    going to say that they were fighting for American interests,

9    which is where this all began is the relevance of the

10   participation in a militia is the weapons training and the

11   willingness to go fight and do things that lineup with your

12   views, whatever they are.  You know, it would be just as

13   relevant if he was going to fight for noble causes against evil

14   and those points that make it relevant.

15           MR. MURRELL:  I understand the Court's ruling.  But,

16   again, if Mr. Baker testifies he will certainly explain that who

17   he was fighting and what he did in Syria.  So, again, I suppose

18   if nothing else, that opens him to further testimony.

19           THE COURT:  Well, if there's testimony in the defense

20   case that the nature of the organization was one thing wouldn't

21   that allow the government on rebuttal to say the opposite?

22           MR. MURRELL:  If they have an expert, sure.

23           THE COURT:  Okay.  I don't know if that --

24           MR. MURRELL:  And I don't know that they'll put an FBI

25   agent on who is going to be an expert.  Certainly, given the

1    rigorous standards that the government wants to apply I don't

2    think he would qualify.

3         THE COURT:  Well, I guess getting back to your

4    question, Mr. Fields, which I think is an appropriate one, is if

5    the cross examination, which sounds like there is not going to

6    be cross examination on this, it would not violate the -- if the

7    witness is capable of answering Mr. Murrell's questions about

8    whether they were aligned with or opposed to ISIS, certainly

9    you'd be allowed to ask on redirect, isn't it true about the

10   other.  If the person knows.  Not, you know, you don't disagree

11   with that do you, Mr. Murrell?

12        MR. MURRELL:  Well, I don't know how he knows.  I

13   mean, did he --

14        THE COURT:  No.  But the question was, if you are on

15   cross examination --

16        MR. MURRELL:  I'm not going to ask that question.

17        THE COURT:  Okay.  Well, then, that resolves the

18   issue.

19        MR. FIELDS:  Thank you.  And then the second issue,

20   Your Honor, was with respect to the George Soros expert, we just

21   talked about it, but Mr. Murrell is going to introduce an

22   exhibit about George Soros.  It's already actually going to be

23   in evidence as a YouTube video.  It's really a comment.  We're

24   not going to talk about George Soros.  I just wanted to be

25   upfront with the Court that that will be in evidence.  We're not

1    going to make that a feature of our case at all.

2         THE COURT:  Which exhibit is that?  I know I saw it

3    before but I didn't see it in today's package.  I thought that

4    that was something that maybe came out.

5         MR. FIELDS:  It's actually what it is, Your Honor,

6    it's going to be technically part of Exhibit 6.  It's a YouTube

7    search warrant that was conducted.  And Mr. Murrell has the

8    screen shot of the video that he's going to introduce where

9    Mr. Baker says in the comment section that he's funded by George

10   Soros.  And so I just wanted the Court to know that that's

11   already going to be in evidence which is why we didn't object to

12   it.  But we're not introducing that or, I'm sorry, we're not

13   going to make that a feature of our case.  So I just wanted to

14   be sure that that didn't open the door to an expert.

15        THE COURT:  Okay.  I see what you're saying.  The

16   representation before, as I understand it, that there be no

17   mention of Soros at all.  If that were the case, I think it

18   would be more difficult for Mr. Murrell to get in the expert who

19   would talk about George Soros.  If there's anything in the

20   record about George Soros that does change the analysis.  I'm

21   not sure it opens the door or resolves the question.  We'll have

22   to see how the overall presentation is and what happens at that

23   point.  But does that answer your question or help?

24        MR. FIELDS:  Yes, sir.

25        THE COURT:  Anything further from the government side?

1          MR. FIELDS:  No, Your Honor.  Thank you.

2          THE COURT:  Mr. Murrell, anything on your side?

3          MR. MURRELL:  Nothing further.

4          THE COURT:  Very good.  Well, I appreciate everyone's

5    time today.  I do think we got some things resolved.  And, like

6    I said, if something else comes up between now and then we can

7    make another hearing time available, otherwise we'll see you all

8    Tuesday morning.

9          MR. MURRELL:  I don't have anything further.

10          THE COURT:  Okay.  Well, thank you both.  We are

11    adjourned.

12      (Proceedings concluded at 4:23 on Wednesday, April 28,

13    2021.)

14                    *  *  *  *  *  *  *  *

15          I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter.
16    Any redaction of personal data identifiers pursuant to the
    Judicial Conference Policy on Privacy are noted within the
17    transcript.

18

19    /s/ Lisa C. Snyder                    11/23/2021

20    Lisa C. Snyder, RPR, CRR              Date
    Official U.S Court Reporter

21

22                          **I N D E X**

23

24    DEFENDANT'S EXHIBITS              OFFERED   RECEIVED

25    1 and 2 Enders and Phillips CV        3         3

DEFENDANT'S WITNESSES                                    PAGE

DR. ADAM ENDERS
Direct Examination By Mr. Murrell                          4
Cross-Examination By Mr. Fields                           9

DAVID PHILLIPS
Direct Examination By Mr. Murrell                         20
Cross-Examination By Mr. Fields                           28
Recross-Examination By Mr. Fields                         36

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25